UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON GAS COMPANY d/b/a KEYSPAN ENERGY DELIVERY NEW ENGLAND,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY INDEMNITY COMPANY,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No: 02-12062RWZ |

**MEMORANDUM OF LAW IN SUPPORT OF LONDON MARKET INSURERS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION INTO EVIDENCE OF DEPOSITION OF MENDES & MOUNT AND LONDON MARKET DOCUMENTS PRODUCED AT PRV 0001-2978**

Third-Party Defendants Certain Underwriters at Lloyds, London and Certain London Market Insurance Companies (collectively, "London Market Insurers") come before this Court, in advance of the November 14, 2005 trial date, and move *in limine* to preclude the introduction into evidence of the deposition of Mendes & Mount and London Market Insurers' documents, consisting of attorney–client communications and attorney work-product, produced at PRV 0001-2978. Neither the deposition of Mendes & Mount, ordered by the Court over vehement objection, nor the documents, produced reluctantly and only after Court Order after persistent claim of privilege, are relevant to the subject matter of this action or admissible in any way. London Market Insurers therefore respectfully request that this Court order their preclusion from evidence in the trial of this matter.

## PROCEDURAL HISTORY

The Court is well aware of the genesis of the compelled production of the London Market privileged documents and the deposition of Mendes & Mount. The relevant procedural record is recited on pages 2-5 of London Market Insurers' Memorandum In Opposition to Boston Gas

1

968818v1

Company's Motion for Sanctions and Request for Hearing, dated March 4, 2005 [Docket. No. 235] ("Opposition to Sanctions").

Briefly, a subpoena was issued to Mendes & Mount in early 2004 for testimony on topics relating to how the London Market Insurers allegedly "handled" the claim by Boston Gas for insurance coverage for the 26 Massachusetts sites at issue (25 MGP sites and one smelter facility). Simultaneously, Boston Gas moved to compel many of the documents listed on London Market Insurers' privilege log. London Market Insurers responded by moving to quash the subpoena and for a protective order to preclude the deposition or the production of documents.

The Court heard oral argument on the various motions in June 2004. During argument, the Court seemed to accept Boston Gas' unsupported contention that Mendes & Mount was not acting as a law firm but as "claims handlers" on behalf of London Market Insurers. A summary Order was issued denying the motion to quash and for a protective order.

London Market Insurers moved for reconsideration. They stressed that the documents were not only privileged and confidential, offering them for an *in camera* review to demonstrate this fact, but further that the documents were not admissible at trial (and therefore not discoverable) for two reasons. The first reason was that Boston Gas could not introduce these documents at trial against London Market Insurers as Boston Gas had no claim against London Market Insurers. The second reason was that Boston Gas could not use the London Market documents against Century Indemnity because (even assuming that the confidential documents at issue could somehow be considered "claims handling" materials) they were irrelevant to prove coverage under the *Century Indemnity* policies.

The motion for reconsideration was denied, and the documents were thereafter produced in redacted form, consistent with the Court's direction. The deposition of Mendes & Mount was

conducted in January 2005. The deposition was designated as confidential under the Protective Order previously entered by the Court. That designation has never been challenged.

The redacted documents produced consisted of attorney reports and analyses. London Market Insurers complied with the Court's ruling by producing those portions of the reports that could be considered largely factual in nature, while preserving those portions of the analyses that were clearly attorney work-product and legal advice. These documents were also marked as confidential under the Protective Order. That designation has also never been challenged.

Boston Gas subsequently moved for sanctions, and sought the production of the documents in unredacted form, as well as a further deposition of Mendes & Mount. The motion and opposition were filed under seal. On August 31, 2005, the Court denied Boston Gas' motion, finding that the redactions were made consistent with the descriptions on the Privilege Log. [Dkt. No. 281].

London Market Insurers now move to preclude the use of these materials at trial or their admission into evidence by any party.

## ARGUMENT

### I.  The Documents and Deposition Are Not Admissible By Boston Gas Against London Market Insurers

During the recent conferences, the Court has focused on the trial aspects of this case. In particular, the Court has closely questioned both Boston Gas and Century Indemnity as to the role of London Market Insurers in this action.

Boston Gas has sued Century Indemnity for insurance coverage for environmental damage claims at the 26 sites at issue under general liability policies for the period from 1951-1969. The policies are first layer excess above a self-insured retention. (Century apparently disputes that it issued coverage from 1951-1960 or, if it did issue policies to Boston Gas, Century

3

968818v1

contends that property damage was not included in the coverage grant of these policies). Boston Gas further claims that it can "pick and choose" any Century Indemnity policy sued upon to respond to its claims should property damage be found to have taken place during the term of that policy. Boston Gas has expressly chosen *not* to sue London Market Insurers; instead, Century Indemnity impleaded London Market Insurers into this case as Third-Party Defendants on a claim for contribution.

London Market Insurers opposed discovery of the documents ultimately produced at PRV 0001-2978, consisting of attorney work-product and attorney reports to their clients, on the grounds that this material was and is irrelevant to Boston Gas' claims against Century Indemnity, and that London Market Insurers, being Third-Party Defendants, are in the case only because of the derivative contribution claims of Century. In fact, under the recent amendments to the Federal Rules of Civil Procedure, the discovery sought was improper precisely *because* it was not probative of any claim between Boston Gas and London Market Insurers. *See RLS Assoc. LLC v. United Bank of Kuwait, PLC*, 01 Civ. 1290, 2003 WL 1563330, *7-8 (S.D.N.Y. March 26, 2003) (declining to order production of documents arguably related to "subject matter of lawsuit," but not relevant to parties' specific claims and defenses) (attached as Exhibit A)[1]. The only response Boston Gas ever made to attempt to justify discovery of this privileged material was to feebly state that "it might yet bring a direct action against London." "Reply in Support of Boston Gas Company's Motion to Compel London Market Insurers to Produce Certain Documents" dated August 25, 2004, p. 1 [Docket. No. 198]. Needless to say, that motion to amend was never made. *See* Opposition to Sanctions [Docket No. 235] at p. 13.

---

[1] Whether London Market Insurers properly handled Boston Gas' claims under policies which were excess to Century Indemnity plainly is inadmissible by Boston Gas against Century as well. See infra.

4

968818v1

Since neither the documents produced, nor the testimony elicited of Mendes & Mount at deposition (which was essentially confined to the documents in question, *see* Opposition to Sanctions [Docket No. 235] at p. 13) are probative of any claims against London Market Insurers by Century, and since no direct claims were ever brought against London Market Insurers by Boston Gas, the motion *in limine* should be granted.

### II.  The Documents And Testimony Are Inadmissible By Boston Gas Against Century Indemnity and Vice Versa

Similarly, the confidential attorney communications and work product of London Market Insurers' counsel have nothing whatsoever to do with Boston Gas' claims for insurance coverage against Century Indemnity.  The policies are different.  The London Market polices have different wordings, and are excess to the first layer Century polices in all years.

Even if the attorney-client privileged documents at issue were to be considered "claims handling" materials, Boston Gas has never articulated any theory as to how such documents could prove its case against Century or rebut any defense asserted by Century.  There is no bad faith claim against Century, so even *Century's* claims handling is not at issue, let alone London Market Insurers'.  Even if there were a bad faith count against Century, upper layer excess insurers such as London Market Insurers have *no duty* to investigate claims. *See e.g., St. Paul Fire and Marine Ins. Co. v. Children's Hospital National Medical Center*, 670 F. Supp. 393, 402 (D. D.C. 1987); *State Farm Fire & Cas. Co. v. Jioras*, 24 Cal. App. 4th 1619, 1626 – 1627, 29 Cal. Rptr. 2d 840, 844-45 (Cal. Ct. App. 1994). *See also* Opposition to Sanctions [Docket No. 235] at pp. 13-14.[2]  Thus, the legal obligations between London Market Insurers and Century

---

[2] The issues of notice to an upper layer excess insurer, as compared to a first layer insurer such as Century, would also be quite different. *See* Opposition to Sanctions [Docket No. 235] at pp. 9-13.

5

968818v1

Indemnity vis-a-vis Boston Gas differ so significantly that London Market "claims handling" materials could have no significance.

Because the documents cannot be used by Boston Gas against Century, and therefore cannot be used by Century to defend against Boston Gas, the motion *in limine* should be granted.

### III. Century May Not Use The Documents and Testimony Against London Market Insurers.

The documents at issue, containing the analysis of facts regarding Boston Gas' claim against London Market Insurers, are immaterial to the issue of Century Indemnity's contribution claim against London Market Insurers, which solely concerns allocation issues between the parties in the event of an adverse judgment against Century. The documents are devoid of any statements that could remotely bear, either as a factual or legal issue, on this matter. Even assuming that there are such statements, *e.g.*, focusing on issues of notice or costs, these would only be duplicative of the non-privileged documents already produced. Of course, evidence concerning policy defenses based on the wordings of the insurance contracts at issue is best proved by the policies themselves, which have been produced. Thus, the privileged documents at issue in this motion are totally unnecessary to any contribution claim that Century has against London Market Insurers.

The motion *in limine* should be granted.

### CONCLUSION

For the reasons stated, the documents produced over objection and claim of privilege by London Market Insurers, Bates Nos. PRV 0001-2978, and the deposition of Mendes & Mount, should be precluded from use at trial by any party.

**LONDON MARKET INSURERS**

By their attorneys,

/s/ John T. Harding

_____
John T. Harding, Jr. (BBO #221270)
**MORRISON, MAHONEY & MILLER, LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7500

and

/s/ Robert P. Firriolo

_____
Thomas J. Quinn
Stephen T. Roberts
Robert P. Firriolo
**MENDES & MOUNT, LLP**
750 Seventh Avenue
New York, NY 10019
(212) 261-8000

**Of Counsel:**
John G. McAndrews
**MENDES & MOUNT, LLP**
750 Seventh Avenue
New York, NY 10019
(212) 261-8000

Dated: October 17, 2005

7

968818v1

**EXHIBIT A**



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
(Cite as: 2003 WL 1563330 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
RLS ASSOCIATES, LLC, Plaintiff,
v.
UNITED BANK OF KUWAIT, PLC, Defendants
No. 01Civ.1290CSHDF.

March 26, 2003.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

*1 In this contract case, plaintiff RLS Associates, LLC ("RLS") claims that defendant United Bank of Kuwait, PLC ("UBK") has failed to pay RLS commissions due and owing under the terms of a series of written consulting agreements. It does not appear to be disputed that, at least under certain circumstances, UBK was entitled to terminate the parties' agreements, which it did in February 2000. According to RLS, however, if UBK terminated the agreements, it was then required by the agreements' terms to pay RLS an additional year's worth of consulting fees, following the termination. (*See* Complaint ¶¶ 8, 12-13.) These additional fees, RLS claims, were due on February 14, 2001 (*see* Letter to the Court from Michael H. Smith, Esq., dated March 6, 2003 ("3/6/03 Smith Ltr."), at 2), but payment remains outstanding. In defense of RLS's claim, UBK alleges, *inter alia,* that it terminated the RLS agreements because RLS's principal, Richard Swomley ("Swomley") had made statements that were "prejudicial" to UBK's interests. (Answer ¶ 30.) UBK further alleges that, under the parties' agreements, this basis for termination relieved it of any contractual obligation to pay fees to RLS subsequent to the termination. (*Id.* at 30-32.)

While RLS's claims and UBK's defenses are not themselves complex, RLS's motion to compel certain discovery from UBK has raised complicated issues, in particular with respect to the proper scope of the attorney-client privilege and the work product doctrine.

The first issue involving privilege was resolved by this Court in an oral ruling on October 10, 2002. That issue related to the question of whether communications between UBK (a United Kingdom corporation) and its in-house lawyers should be protected as privileged, when those lawyers were not admitted to the bar of any jurisdiction and were not licensed attorneys under U.K. law. After consideration of the parties' arguments and submissions, including a declaration of one of the UBK lawyers concerned and a competing declaration by a U.K. legal expert retained by RLS, the Court concluded that UBK was not entitled to rely on the attorney-client privilege to protect the communications at issue.

The additional issues on which the Court has since focused involve privilege and/or work product claims asserted by UBK as grounds for withholding specific documents from production. The Court has reviewed these documents *in camera,* and has held a series of lengthy conference calls with the parties to hear and consider their respective positions. At the Court's request, the parties have also supplemented their briefing, submitting further documents and argument to address issues of particular concern to the Court. The Court now issues this Memorandum and Order to summarize the rulings it has made on the record to date with respect to the documents in question, and to make final rulings with respect to any matters not resolved as of the time of the last conference. In one instance, as described below, the Court has also, *sua sponte,* reconsidered a prior ruling, and hereby modifies that ruling. As stated by the Court at the last conference, the parties' time to appeal from any ruling relating to these documents shall run from the date of this Order.

*DISCUSSION*
I. *APPLICABLE LEGAL STANDARDS*

*2 As jurisdiction in this case is based on diversity (*see* Complaint ¶ 4), the New York law of privilege applies. *See Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs., Inc.,* No. 96 Civ. 5590(MJL)(HBP), 1998 WL 729735, at *3 (S.D.N.Y. Oct. 14, 1998). "In New York, the attorney-client privilege protects confidential communications between attorney and client relating to legal advice." *Id.* (citing N.Y.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C.P.L.R. § 4503(a)); *Rossi v. Blue Cross & Blue Shield of Greater N.Y.,* 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508, 510, 540 N.E.2d 703 (1989).

In some circumstances, the attorney-client privilege may be expanded by application of the "common interest rule." See *United States v. Schwimmer,* 892 F.2d 237, 243-44 (2d Cir.1989). This rule recognizes that communications between one party and an attorney for another party may be protected by privilege, where the parties share a common legal interest. *See id.* The communications, however, must be made "in the course of an ongoing common enterprise and [be] intended to further the enterprise." *Id.* at 243. Further, the common interest rule does not itself give rise to a separate privilege. *Bruker v. City of N.Y.,* No. 93 Civ. 3848(MGC)(HBP), 2002 WL 484843, at *4 (S.D.N.Y. Mar. 29, 2002). "Rather, it is a limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party outside the attorney-client relationship." *Id.; accord, SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC,* No. 01 Civ. 9291(JSK), 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002).

Apart from privilege, Rule 26(b)(3) of the Federal Rules of Civil Procedure protects documents as work product, where they have been prepared "in anticipation of litigation or for trial by or for [a] party or by or for that ... party's representative." The phrase "in anticipation of litigation" has been construed by the Second Circuit to mean that, " 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." ' *U.S. v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994)). If the document would have been prepared in "essentially similar form," regardless of the prospect of litigation, then it cannot be characterized as work product. *See id.*

Both privilege and work product protection may be waived by the conduct of the parties. For example, where a party selectively discloses certain privileged or work product material, but withholds similar (potentially less favorable) material, principles of fairness may require a more complete disclosure. *See, e.g., In re Grand Jury Proceedings,* 219 F.3d 175, 182-84 (2d Cir.2000) (discussing privilege waiver); *U.S. v. Nobles,* 422 U.S. 225, 239-40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (work product waiver).

Waiver of privilege and work product protection may also result from a party's injection of an issue into the litigation that, in fairness, requires the party to disclose otherwise protected material. See *In re Grand Jury Proceedings,* 219 F.3d at 182 ("This court has recognized that implied waiver may be found where the privilege holder 'asserts a claim that in fairness requires examination of protected communications." ') (quoting *U.S. v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991)).

*3 Privilege is also waived by voluntary disclosure to a party outside the privileged relationship, *see, e.g., In re Kidder Peabody Secs. Litig.,* 168 F.R.D. 459, 468 (S.D.N.Y.1996), and work product is waived by voluntary disclosure to an adverse party, *see In re Steinhardt Partners, L.P.,* 9 F.3d 230, 235 (2d Cir.1993). Where, however, work product is disclosed to a third party aligned in interest with the author, the claim of work product protection may be maintained. See *Adlman,* 134 F.3d at 1199-1200 (work product may be shown to others "simply because there [is] some good reason to show it," without necessarily destroying the work product nature of the document); *ECDC Envtl., L.C. v. N.Y. Marine & Gen'l Ins. Co.,* No. 96 Civ. 6033(BSJ)(HBP), 1998 WL 614478, at *4 (S.D.N.Y. June 4, 1998) ("Disclosure of material protected by the work-product doctrine .... results in a waiver of the protection afforded by that doctrine only when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary.") (citations omitted).

The party attempting to rely on a claim of privilege or work product immunity has the burden of demonstrating that the privilege or work product protection exists, and has not been waived. *See, e.g., von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir.1987); *Bowne of New York City, Inc. v. AmBASE Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y.1993). Although materials prepared in anticipation of litigation are not absolutely protected from disclosure, once it is established that materials are subject to work product immunity, the party seeking to obtain such materials has the burden of demonstrating that it has "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3).

II. *THE DOCUMENTS AT ISSUE* [FN1]

FN1. The parties have agreed that the Court

Case 1:02-cv-12062-RWZ   Document 317   Filed 10/17/2005   Page 11 of 15

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
(Cite as: 2003 WL 1563330 (S.D.N.Y.))

need not separately consider documents that are either the same as, or very similar to, other documents submitted for the Court's review. The documents that fall in this category have been numbered by UBK as Documents Nos. 27, 53, 55, 93, 96, 105, 112, 119, and 120. The Court assumes these documents will simply be treated in accordance with the Court's relevant rulings.

A. *UBK's Claims of Attorney-Client Privilege*

Only one document submitted by UBK for review, Document No. 123, constitutes a communication between UBK and its own outside counsel. This communication, in which UBK asks for legal advice, is plainly covered by the attorney-client privilege, and thus the only question is whether privilege has been waived by UBK's partial disclosure of the substance of the advice received. (*See* Letter to the Court from Michael H. Smith, Esq., dated November 22, 2002, at 4 (suggesting that a UBK witness "discuss[ed]" the lawyer's advice during the witness's deposition).) The Court remains unclear as to what the alleged disclosure was, and the extent of that disclosure, and has asked the parties for further clarification. As stated on the record, however, the Court notes that testimony voluntarily disclosing a portion of a privileged communication generally gives rise to a waiver of privilege as to the communication as a whole. *See, e.g., von Bulow v. von Bulow (In re von Bulow), 828 F.2d 94, 101-02 (2d Cir.1987)* ("[I]t has been established law for a hundred years that when the client waives the privilege by testifying about what transpired between her and her attorney, she cannot thereafter insist that the mouth of the attorney be shut. From that has grown the rule that testimony as to part of a privileged communication, in fairness, requires production of the remainder.") (citations omitted).

*4 UBK has argued that a second document (Document No. 45) is subject to "privilege" protection under the common interest rule. The Court initially accepted that argument, ruling in UBK's favor at the last conference. Upon further consideration, however, and in light of the documents submitted to the Court by UBK on March 7, 2003, the Court hereby alters that ruling and rejects the "common interest" argument. The document in question consists of two e-mail communications, dated January 7, 2000, between representatives of UBK and attorneys for the IIBU Fund II PLC (the "Fund"), for which UBK served as General Investment Advisor, pursuant to a written contract.

The communications relate to the Fund's dealings with two entities, Capital Associates and PLM, and with their disposition of certain funds or other assets.

Initially, the Court believed that the Fund and UBK had a common interest in the matters that were the subject of the e-mails contained in Document No. 45, and that the Fund's attorney was advising both entities in connection with their common pursuits. The Court now understands, however, that it is UBK's contention in this case that Swomley, RLS's principal, made statements *to the Fund* that were critical of UBK's performance, and that it was those statements, in part, that gave UBK grounds to withhold payment to RLS of any post-termination consulting fees. (*See* Answer ¶ ¶ 29-31; *see also* letters to the Court from Loren F. Selznick, Esq., dated March 4, 2003 ("3/4/03 Selznick Ltr.") and March 7, 2003 ("3/7/03 Selznick Ltr.").) Upon review of the statements made by Swomley to the Fund that were allegedly prejudicial to UBK (*see* 3/4/03 and 3/7/03 Selznick Ltrs. and documents attached thereto), it is evident that certain of those statements preceded the e-mails at issue. In that context, it now appears to the Court that, in these e-mails, the Fund's attorney was seeking to ensure that UBK would act in a manner that was consistent with the *Fund's* interest, which is different from advising parties jointly as to their *common* interest. The Court therefore finds that UBK has *not* met its burden of demonstrating that Document No. 45 should be protected as privileged by the common interest rule. Accordingly, this document should be produced.

The Court does, however, accept UBK's assertion of attorney-client privilege with respect to Document No. 104. That document contains a communication from the Fund's counsel to UBK, asking for documents to assist counsel in rendering advice to the Fund. In this instance, the documents sought by the Fund's counsel were apparently generated within the scope of the duties performed by UBK on the Fund's behalf. *See* Investment Advisory and Liquidity Underwriting Agreement, between the Fund and UBK, dated February 4, 1994, at 3.2. [FN2] For this reason, the communication at issue is appropriately protected as privileged. *See In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 218 (S.D.N.Y.2001)* (protecting as privileged communications between corporation's counsel and corporation's agent, where the agent "possessed the information needed by the corporation's attorneys in order to render informed legal advice") (citing *Upjohn Co. v. United States, 449 U.S. 383, 391, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)*).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-12062-RWZ    Document 317    Filed 10/17/2005    Page 12 of 15

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
(Cite as: 2003 WL 1563330 (S.D.N.Y.))

> FN2. A copy of this agreement was annexed as Ex. A to the letter to the Court from Michael H. Smith, Esq., dated November 22, 2002.

B. *UBK's Claims of Work Product Immunity*

**\*5** Upon review of the documents, and after consideration of UBK's explanations as to the context of the documents' preparation, the Court is persuaded that each of the following documents, in whole or in part, are entitled to protection as UBK's work product: Documents Nos. 24, 25, 42, 49, 86, 89, 90, 91, 127, and 128. Documents Nos. 86, 89, 127 and 128 anticipate litigation on their face. [FN3] The remaining six documents either analyze UBK's exposure on potential claims or plan steps in the face of potential claims. It appears that, but for concerns about potential litigation, the analyses contained in these documents would not have been prepared in essentially similar form. Accordingly, all of these documents (or the portions reflecting UBK's work product) are properly characterized as work product. *See U.S. v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998). As RLS has not made a showing of substantial need for these documents, they need not be produced. To the extent the documents only partially reflect UBK's work product, redactions should be made as stated by the Court on the record.

> FN3. It is not entirely clear whether Document No. 128, which mentions a potential lawsuit, is referring to a lawsuit involving UBK itself, or a suit involving only third parties (in which case, it is arguably not protectible as work product). In reviewing this document together with the contemporaneous Document No. 109, the Court's best reading of both documents is that they both contemplate potential litigation involving *UBK*. In any event, Document No. 128 is not relevant to this action for the reasons discussed *infra* at 13-15, and need not be produced on that basis.

Document No. 121, however, which is also claimed by UBK as work product, should be produced. In this document, UBK analyzes various contract terms, for the apparent purpose of determining whether it was contractually required to perform certain obligations. Although UBK may have been concerned that, should it opt to follow a certain course, litigation might follow, it appears that the document, or an essentially similar document, would have been created irrespective of the anticipated litigation. For this reason, the document may not be protected as work product. *See id.* at 1203-05 ("[w]hether it can fairly be said that the [document at issue] was prepared because of ... expected litigation really turns on whether it would have been prepared irrespective of the expected litigation").

C. *Documents Prepared by the Fund*

1. *UBK Lacks Standing To Assert Privilege or Work Product Immunity As To These Documents*

Finally, five of the documents withheld by UBK (Documents Nos. 101, 109, 110, 111, and 113) were apparently *not* prepared by or on behalf of UBK, but rather were created by various directors or officers of the Fund. It seems that a representative of UBK (Mr. Bruno Martorano) sat on the Fund's board of directors, and, in that capacity, had access to these Fund documents. It is likely that Mr. Martorano then passed the documents on to others in UBK management, as copies of the documents were found in UBK's files.

In some instances, these documents reveal legal advice given to the Fund by its attorneys, or communications within the Fund expressly relating to the seeking of legal advice from its counsel. In other instances, the documents, at least in part, anticipate potential litigation involving the Fund. With respect to these documents, however, it does not appear that UBK has standing to assert either a privilege or a work product claim, as either such claim would properly belong to the Fund.

**\*6** The Court does not accept UBK's various arguments that it should be permitted to assert attorney-client privilege as to any of these documents. Unlike Document No. 104, discussed above, nothing on the face of the purportedly privileged documents suggest that they had to be shared with UBK, as the Fund's agent, in order for the Fund to obtain meaningful legal advice. Further, after careful review of these documents, the Court is persuaded that the common interest rule should not apply to restrict disclosure here. Neither UBK nor the documents themselves have demonstrated that these communications were being shared with UBK because of a common legal interest; if anything, at least some of the documents suggest that the Fund and UBK may *not* have been entirely aligned in interest with respect to the subject matter of the communications.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
**(Cite as: 2003 WL 1563330 (S.D.N.Y.))**

Page 5

Finally, although UBK argues that, as a shareholder in the Fund, it was necessarily entitled to disclosure of the Fund's privileged communications, the cases UBK cites do not actually support that proposition, or the further proposition that UBK is thus entitled to assert the privilege on the Fund's (or its own) behalf. The privilege issue in *In re a Witness before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir.2002), arose in the context of a federal criminal investigation of a state government official. The Seventh Circuit pointed out that this posed "a special case: the client is neither a private individual nor a private corporation. It is instead the State of Illinois itself." *Id.* at 291. The court then engaged in a lengthy discussion of the differences between the obligations and responsibilities of the government lawyers, on the one hand, and members of the private bar, on the other. *Id.* at 293-94. The second case cited by UBK, *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), involved a demand by stockholders for a corporation's disclosure of otherwise privileged communications, where "the corporation [was] in suit against its stockholders on charges of acting inimically to stockholder interests." *Id.* at 1103-04. Although the court allowed disclosure to the stockholders, it limited its holding to the circumstances presented, and noted that "[t]he attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders." *Id.* at 1103.

Here, if there is a privilege claim to be asserted with respect to the five documents generated by the Fund, that claim is for the Fund to assert, *see In re a Grand Jury Subpoena Duces Tecum Dated Feb. 18, 1988*, 685 F.Supp. 49, 50-51 (S.D.N.Y.1988) ("the possessor of the claimed privilege or right may intervene to assert it") (quotation omitted), but the Fund has not, to date, requested an opportunity to be heard. Further, should the Fund seek to protect any of these documents as containing privileged information, it would be the Fund's burden to demonstrate why privilege had not been waived by disclosure to UBK.

*7 As for the work product that may be contained in these documents, the same basic analysis holds, in that the Court does not see any basis for UBK to assert a work product claim on the Fund's behalf. Yet, once again, the Fund has not yet sought to assert such a claim on its own behalf. *See id.* at 51 (allowing third party to intervene to assert work product claim). Should the Fund seek to assert a work product claim, it would again be the Fund's burden to show that no waiver resulted from its disclosure to UBK. Although the waiver rules are somewhat different with respect to privilege and work product (*see supra* at 5), the Fund would nonetheless have to demonstrate that its disclosure of these documents to UBK was consistent with maintaining work product protection. *See Adlman*, 134 F.3d at 1199-1200.

In two telephone conferences, the Court offered UBK's counsel an opportunity to contact counsel for the Fund, to see if the Fund wished to seek to intervene in this action for the limited purpose of challenging the Court's ruling that these documents should be disclosed. It is the Court's understanding that, as UBK is now also pressing a relevance objection with respect to the discoverability of four of these five documents (Documents Nos. 101, 109, 111, and 113), UBK is awaiting the Court's decision on that objection before deciding whether to approach the Fund regarding potential intervention. UBK now also asserts a relevance objection with respect to the discoverability of Document No. 128, discussed above. (*See supra* at 8 and 9 n. 3.)

*2. UBK's Relevance Objection*

Under Rule 26 of the Federal Rules of Civil Procedure, as amended in 2000, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Prior to the 2000 amendment, discovery was authorized as to any matter relevant to the subject matter of the case. The amendment narrowed the scope of permissible discovery, so that the focus would be on the parties' claims and defenses. *See* Fed.R.Civ.P. 26(b)(1) advisory committee's note ("The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action."). The amended rule gives the Court discretion to order broader discovery, but only "[f]or good cause." Fed.R.Civ.P. 26(b)(1). "When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action." Fed.R.Civ.P. 26(b)(1) advisory committee's note.

Here, the crux of RLS's relevance objection, which was argued by UBK for the first time in the last of the Court's conferences relating to these documents, [FN4] is that the documents in question are not reasonably calculated to lead to admissible evidence with respect to any "claim or defense" asserted in the case. As mentioned above, RLS claims that UBK owes it certain consulting fees, and, by way of an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
(Cite as: 2003 WL 1563330 (S.D.N.Y.))

Page 6

affirmative defense, RLS contends that it was not required to pay those fees, because its reason for terminating RLS's agreements was that Swomley had made statements prejudicial to UBK's interest. UBK now argues that the documents at issue, which are dated May 11, 2001 (Document No. 101), August 7, 2001 (Document No. 128), August 5, 8 and 9, 2001 (Document No. 109), February 8, 2002 (Document No. 111), and March 26 and 28, 2002 (Document No. 113) were all generated well subsequent to its decisions to terminate RLS's agreements and to withhold further fees, and thus could not bear on those decisions.

> FN4. Because UBK did not choose to press its relevance objections until quite recently (indeed, only after the Court expressed doubt that UBK had standing to raise certain privilege or work product claims), RLS argues that UBK's relevance objections should be deemed waived. UBK, however, did preserve its relevance objections in its responses to RLS's document demand (*see* RLS's Response to First Request for Production of Documents, submitted with 3/4/03 Selznick Ltr.), and, rather than deem a potentially meritorious objection to be waived simply because counsel first focused on defending a challenge to its claims of privilege, the Court will consider the relevance issue.

*8 RLS, for its part, argues that, if the documents relate to the continuing relationship between the Fund and RLS, then they will likely show that UBK was not, in fact, prejudiced by Swomley's statements. RLS points out that, although UBK terminated the RLS agreements in February 2000, UBK was not obligated to pay any additional fees to RLS until a year later, in February 2001. RLS thus suggests that, even if UBK was concerned enough about Swomley's statements in February 2000 to justify contract termination, the fact that UBK was then able to maintain its relationship with the Fund over the following year shows that, as of February 2001, any concern about prejudice would no longer have been reasonable, and could not have justified the withholding of RLS's additional fees when due. (*See* 3/6/03 Smith Ltr. at 2 ("If UBK ... learned by February 14, 2001 or thereafter that its belief was no longer reasonable, then [its] 'defense' is of no avail.")

RLS's argument would have some force with respect to documents demonstrating the nature of UBK's relationship with the Fund over the period from February 2000 to February 2001. It does not, however, have equal force with respect to documents generated after February 2001. Unless such documents look back in time, to describe UBK's reasons for having terminated the RLS agreements or having withheld fee payments, or to discuss Swomley's allegedly prejudicial statements, they would not appear to be relevant to UBK's defense as pleaded. With one exception (the first four lines of the second bullet point in Document No. 110, which UBK has now agreed to produce (*see* 3/7/03 Selznick Ltr. at n. 1)), the documents at issue do not fit this description. Nor do the documents appear to be relevant to any other claim or defense in the case.

The documents do, in general terms, relate to Swomley and his job performance, as well as to UBK's resolution of a dispute with the Fund concerning fees generated by the UBK-RLS agreements. Although these issues are relevant to the underlying "subject matter" of the action, this does not make then relevant to the parties' specific claims and defenses, and the Court does not perceive good cause for requiring their production. At bottom, the Court is not persuaded that production would serve the reasonable needs of the action. Therefore, with the exception of the relevant portion of Document No. 110, as described above, these documents need not be produced.

*CONCLUSION*

For all of the foregoing reasons, and for the reasons set forth in more detail on the record of the discovery conferences in this action, UBK should produce its withheld documents to the extent set forth above.

Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23671533 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Application for Attorneys Fees (Oct. 20, 2003)

• 2003 WL 23671531 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Jul. 02, 2003)

• 2003 WL 23671530 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment (May. 16, 2003)

• 2003 WL 23671532 (Trial Motion, Memorandum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1563330 (S.D.N.Y.)
**(Cite as: 2003 WL 1563330 (S.D.N.Y.))**

Page 7

and Affidavit) Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment as to Liability (May. 16, 2003)

• 2002 WL 32595510 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motion to Reargue (Aug. 14, 2002)

• 2002 WL 32595508 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Reconsideration and Partial Stay (Jul. 31, 2002)

• 2002 WL 32595506 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Application for Fees and Costs (Mar. 26, 2002)

• 2001 WL 34611464 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motion to Vacate Default Judgment (Aug. 03, 2001)

• 2001 WL 34611462 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Relief from Default and Stay of Inquest (Jul. 20, 2001)

• 1:01cv01290 (Docket) (Feb. 21, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.