IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON GAS COMPANY d/b/a KEYSPAN ENERGY DELIVERY NEW ENGLAND,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY INDEMNITY COMPANY,<br><br>Defendant. | Civil Action<br>No. 02-12062-RWZ |
| CENTURY INDEMNITY COMPANY,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED, et al.,<br><br>Third-Party Defendants. | |

**MEMORANDUM IN SUPPORT OF CENTURY INDEMNITY COMPANY'S
MOTION IN LIMINE TO ADMIT THE MCKENNA REPORTS**

David B. Chaffin
BBO # 549245
HARE & CHAFFIN
160 Federal Street, Floor 23
Boston, Massachusetts 02110-1700
(617) 330-5000

Guy A. Cellucci
Shane R. Heskin
WHITE and WILLIAMS, LLP
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-7000

Century Indemnity Company submits this memorandum in support of its motion *in limine* for a ruling that two reports prepared by John T. McKenna, Jr., are admissible.

## PRELIMINARY STATEMENT

When Boston Gas first knew or expected that it was contaminating the Everett site is a central issue in this case. The reports that are the subject of this motion are relevant to this issue. Their author is a former high-level executive of Boston Gas who at relevant times was in charge of Boston Gas's manufactured gas operations and the Everett site. His reports indicate that he knew, and therefore Boston Gas knew, that the site was contaminated as early as the 1950s. The reports undercut Boston Gas's claims that it did not expect or intend the alleged damage at issue and that it timely notified Century.

Because the McKenna reports are so damaging to Boston Gas's case, it is desperate to keep them from the jury. Indeed, Boston Gas apparently has engaged in a scheme to bury them and, when that failed, to distort their content. While it has failed in its attempt to hide them, it has not given up. It now raises invalid and meritless objections in an improper attempt to prevent the jury from seeing the truth.

To avoid the time and expense of laying the foundation for the McKenna reports at trial, Century seeks, pursuant to Rule 104, a ruling that the McKenna reports are admissible.

## FACTS

### Mr. McKenna's Deposition Testimony In This Case

Mr. McKenna was deposed in this case on April 14 and November 17, 2004. He was represented by counsel for Boston Gas. (Chaffin Dec., Ex. 1 at 4.) Mr. McKenna explained that he had suffered a stroke and that it had affected his ability to read. (Id., Ex. 1 at 9-10.) Sadly,

1

the stroke also affected his ability to articulate and his memory. Many of his responses were garbled, and he had difficulty remembering many things. (Id., Ex. 1 at 25, 41-44, 57-58, 61, 69-70, 117-18, 138-40, 184-85, 209-10, 214-15, 220.) He did confirm, however, his employment history with Boston Gas, including that he had been stationed in Everett twice, that he had been the manager of gas production beginning in 1964 (and in charge of Everett), and that he had been on Boston Gas's Board of Directors for at least ten years. (Id., Ex. 1 at 27-28, 45, 46-47, 51-52, 78-79, 145.)

Mr. McKenna testified that in the early 1990s, he had done some "loss work" for a law firm in Canada and had prepared a report for the firm. (Id., Ex. 1 at 13, 26.) A copy of the report was marked as an exhibit. He at first confirmed that the exhibit was his report, but qualified his response based on his difficulty in reading, which was the clear result of overt and improper coaching by counsel. (Id., Ex. 3 at 12-13 ; Ex. 1 at 169-71; Ex. 2.) Nevertheless, he confirmed that everything in the report is truthful and accurate. (Id., Ex. 1 at 171, 184-85.)

But when asked about crucial and unambiguous statements in the report, Mr. McKenna, while being coached furiously and impermissibly by Boston Gas's counsel, contradicted them and claimed a loss of memory. (Id., Ex. 1 at 169-86, 235-36, 247.) He was asked about unambiguous statements reflecting his own knowledge in the 1950s and 1960s, and the knowledge of all operators of manufactured gas plants in the 1950s and 1960s, concerning the environmental hazards of manufactured gas plants. He claimed, in the face of directly contradictory language, and with the assistance of counsel, that the statements were based not on personal knowledge, but on a study he had conducted in 1992, and he claimed a loss of memory. (Id.)[1] As to the loss of memory, he explained:

---

[1] Boston Gas's counsel's coaching was not limited to efforts to have him deny that the statements in the report reflected his own knowledge. On the second day of the deposition, Boston Gas's counsel attempted to coach Mr.

2

> Since I had a stroke and I don't read. I don't know what's going on in the world so I can't tell you that things haven't changes since that particular time. But the time that I did this is what I knew was the right way to do it at the time.
> * * * *
> It's been 15 years. I don't remember what's in here (the report). I don't remember some of the words. But what I did was proper at the time.

(Id., Ex. 1 at 184-85.)

Notably, this was not the first time that Mr. McKenna backpedaled. In late 2000, he was deposed in New England Electric System v. Allianz Insurance Co., Civil Action No. 99-00467B (Worcester County Super. Ct.) ("NEES"), another action in which Boston Gas is seeking insurance coverage for environmental liabilities. Century is not in that case. Boston Gas's local counsel in this case represents Boston Gas in NEES and represented Mr. McKenna during the 2000 deposition. Mr. McKenna was asked about the report during the 2000 deposition. There too he claimed that the clear and unambiguous statements in the report concerning his and others' knowledge were based only on his study in 1992. (Id., Ex. 4 at 2-3.) Not so coincidentally, the plaintiffs in NEES, including Boston Gas, recently filed a motion in limine that seeks to exclude the report on the basis, among others, that "the Report [is based] entirely on the observations and opinions of others." (Id., Ex. 4 at 2-3.)

**Boston Gas's Failure To Produce The McKenna Reports Until Confronted**

Boston Gas <u>did not</u> produce the McKenna Report before Mr. McKenna's deposition in this case. (Id., Ex. 1 at 186-87.) <u>This is troubling</u>. According to other deposition testimony in NEES, Boston Gas received the report within two weeks after Mr. McKenna wrote it in 1992. (Ex. 5 at 54-57.) Moreover, although Boston Gas produced it in the NEES action, counsel for

---

McKenna into denying the authenticity of the report. Mr. McKenna was asked whether a copy of the report was "a true and correct copy of the report" he authored. Boston Gas's counsel, knowing full well that Mr. McKenna had said repeatedly that he has difficulty reading, said:
> Objection. I will counsel you to look through the entire report before you answer and to read the entire report.

(Chaffin Dec., Ex. 3 at 12-13.) This was tipping a witness at its finest.

3

Boston Gas made the conscious, unjustified decision in this case <u>not</u> to produce it to Century. Yet, Boston Gas's local counsel in this case was aware of the report at least as of 2000, and, even more troubling, Boston Gas's lead counsel here, Dickstein Shapiro, were aware of the report in 2002, before this action was ever filed. A recently unearthed 2002 Nutter, McClennen bill leaves no doubt that lead counsel knew all along. It reads:

> Conference with J. Gallant (x2) regarding Jack McKenna's witness files; email from same regarding same; review files regarding same
>
> Review witness files regarding Jack McKenna documents regarding Dickstein Shapiro suit; telephone conference with M. Pentz regarding same
>
> Letter to David Elkind regarding Jack McKenna documents; conference with M. Pentz regarding same[2]

Tellingly, the First McKenna report surfaced at his deposition in this case only because counsel for London had obtained it through other means. Century's counsel promptly and vigorously objected to Boston Gas's failure to produce it. (<u>Id</u>., Ex. 1 at 186-87.) After the deposition, Century's counsel wrote Boston Gas's counsel, reiterating the complaint:

> Third, as noted in the deposition of John McKenna, Boston Gas has failed to produce any transcripts of Mr. McKenna's former testimony in other actions. As evident from Mr. McKenna's testimony and as evident from the expert report attached as an exhibit to Mr. McKenna's deposition in the [state court action], these transcripts are highly relevant to the factual and legal issue[s] at issue in this case and are clearly responsive to Century's document requests. We ask that all of Mr. McKenna's former transcripts, reports, affidavit or any other relevant and responsive documents be immediately produced.

(<u>Id</u>., Ex. 7 at 2.) A week later, Boston Gas's co-counsel responded:

> The material you have requested is, in large measure, irrelevant to this litigation and discovery for discovery's sake. In an effort to avoid an unnecessary dispute, however, Boston Gas will include any non-privileged, responsive documents that have not already been produced, with the material provided on April 28th.

---

[2] (<u>Id</u>., Ex. 6.)

4

(Id., Ex. 8.) Boston Gas's counsel did not explain why, as the quoted statement apparently suggested, Boston Gas had been applying a relevance standard rather than the proper standard for the scope of discovery; nor did he explain why, as the letter apparently suggested, Boston Gas apparently had been withholding "responsive documents . . .." The claim that the McKenna materials are "in large measure, irrelevant" is dead wrong, as the following demonstrates.

**The Content Of The First McKenna Report**

In his first report, Mr. McKenna wrote about, at length and in detail, what manufactured gas plant operators, including himself, knew in the 1950s and 1960s concerning the environmental hazards and effects of such plants. Because the statements on this subject in the report come from a former high-level executive and director of Boston Gas who has personal knowledge of the operations at the site at issue, they are critically relevant, and it is clear why Boston Gas improperly withheld the report from Century and has adopted the charade that the statements are based solely on an investigation conducted in 1992. Mr. McKenna wrote, among other things:

> During the first two years of my employment with Boston Gas (July 1950 to July 1952) I was trained in the various aspects of gas plant operations. Subsequent to the completion of my training program, . . . I became a member of the operating committee for the company's manufactured gas plant. That committee was responsible for all operational aspects of that facility. . . .
> * * * *
> The manufactured gas plant operated by Boston Gas and the company's other gas holders were under my direct supervision from 1964 forward and I had responsibility for both their operations and subsequent dismantling. . . . The site occupied by the gas plant was sold to a third party. Boston Gas initially assumed responsibility for the demolition of the plant and for the removal of tars and oils from the site. . . .
> * * * *
> . . . I have been asked by Blake, Cassels & Graydon . . . to provide my opinion and testimony regarding the following issues:
> 1. The technical processes by which gas was manufactured at the Gas Plant.
> 2. Byproducts which would have been created by the processes in use at the Gas Plant.

5

3. What, if anything, was known or should have been known by operators of gas plants about potential hazards of gas plant byproducts, up to approximately August, 1966?

4. What steps, if any, ought to have been taken to properly deal with byproducts when the Gas Plant was taken out of service and thereafter sold?

* * * *

## WHAT WAS KNOWN BY MEMBERS OF THE GAS INDUSTRY ABOUT POTENTIAL HAZARDS OF GAS PLANT BYPRODUCTS, UP TO APPROXIMATELY AUGUST, 1966

**In the 1950s, I was aware** that some workers in the coal gasification industry were exposed to health risks as a result of contact with chemicals produced by manufactured gas processes. **By the mid-60's, I was aware** that a number of American states had imposed worker exposure limits for some of the lighter oils created by manufactured gas processes. **I was also aware** of studies being conducted into whether exposure of coke oven workers to manufactured gas byproducts, and in particular benzene, was reducing their life expectancy. In addition, **I was aware** that many of the heavier tars resulting from manufactured gas processes contained aromatic ring compounds related to benzene. Most of these aromatic ring compounds are now referred to as polyaromatic hydrocarbons (PAHs).

**Further, it was recognized at the time that the tars/oils created as gas plant byproducts contained high concentrations of the same chemicals which posed health risks for gas plant workers. It was generally recognized that the heavier tars produced as gas plant byproducts were long lasting chemicals which would not break down over long periods of time if disposed of in soils. Moreover, it was known that the byproducts, particularly the lighter oils, were capable of migration through soils.**

**I was aware** (and it was well known in the gas industry): that over many decades a number of fish kills had occurred as a result of the discharge of gas plant byproducts into water bodies and had been widely reported; that if gas plant byproducts were allowed to percolate through the soils to potable water, they would give the water a foul taste and smell, rendering it unfit for human consumption; that the tars and oils could also cause staining of clothing washed in contaminated water; and that numerous complaints had been made to other gas companies relating to events of this sort.

**I would expect that any gas plant operator which from time to time had excavated soils on the site of a plant, would likely have encountered tars/oils and spent oxide wastes. In my view, any operator of a gas plant ought to have known that quantities of tars/oils would likely exist on the site of gas plants that had been in operation for a number of years.**

* * * *

**I believe that any competent gas plant operator working in the manufactured gas industry in the 1950's and 60's would have shared these concerns.**

* * * *

STEPS WHICH OUGHT TO HAVE BEEN TAKEN TO PROPERLY DEAL WITH BYPRODUCTS WHEN THE GAS PLANT WAS TAKEN OUT OF SERVICE
* * * *

In many cases, the cost of demolition, cleanup and disposal exceeded the possible return on a sale. In those circumstances, it would have been prudent to retain the land indefinitely. If the land was to be retained, it was acceptable to leave contaminants on site to the extent that control over them could be retained. Steps ought to have been taken even if the land was retained to insure the contaminants would not migrate from the site.

A sale of land to a third party prior to cleanup and without satisfactory assurances that an adequate cleanup would take place, could lead to disastrous results as other parties could be harmed if the purchaser failed to properly deal with contaminants.

**The steps noted [multiple steps to determine the scope of contamination at former MGP plants] were followed by me in evaluating the disposal of plant sites and their cleanup for Boston Gas.** Several sites were sold to third parties following cleanups by Boston Gas. At another site, the cleanup was conducted by the purchaser with the assistance and advice of Boston Gas. In other cases, ownership of the sites was retained because adequate cleanup would have cost more than could be realized from a sale.[3]

## The Authenticating Affidavit

Anticipating that Boston Gas's counsel would try anything to keep the McKenna report from the jury, including a challenge to its authenticity, Century's counsel contacted the law firm for which Mr. McKenna wrote his report. The firm provided an affidavit by a Senior Law Clerk, Louise Marie James, who authenticated the First McKenna Report and a Second McKenna report, on personal knowledge. (Id., Ex. 9.)

## Boston Gas's Refusal To Stipulate To The Authenticity Of The McKenna Report

On September 29, 2005, Century's counsel provided Boston Gas's counsel with a copy of the affidavit of Ms. James and asked Boston Gas's counsel to stipulate to the authenticity of the McKenna reports. (Id., Ex. at 10.) On October 3, 2005, Boston Gas's counsel refused, stating:

Moreover, as we have discussed in the past, Mr. McKenna was not able to authenticate the "report," to which you now refer, when shown the document during deposition. Boston Gas is not in a position to authenticate a document that

---

[3] (Id., Ex. 2 at 1-4, 13-17 (emphasis added).)

the purported author cannot authenticate, and Century's production of a new hearsay affidavit does not authenticate the "report."[4]

## ARGUMENT

### I. THE MCKENNA REPORTS ARE ADMISSIBLE

**A.    The McKenna Reports Are Authentic**

The reasons Boston Gas has given for refusing to stipulate to the authenticity of the McKenna reports are not valid.

**1. Boston Gas's "Hearsay" Objection Is Invalid.** Under Rule 104(a), preliminary questions concerning admissibility are determined by the court. The rules of evidence, except those as to privilege, do not restrict the court in making such determinations. See, e.g., United States v. Flores Perez, 849 F.2d 1, 4, n. 3 (1st Cir. 1988). In Flores Perez, in reviewing the district court's evidentiary rulings, the court of appeals considered facts set forth in an attorney's affidavit submitted in connection with a motion *in limine*.[5] The court noted that "[a]lthough not all of these facts were presented to the jury, admissibility determinations are not bound by the rules of evidence." Id.

The Advisory Committee Notes on Rule 104(a) sanction the use of affidavits in preliminary hearings on admissibility. Likewise, Professors Wright and Graham write that affidavits are among the kinds of technically inadmissible evidence that "should be used" in connection with preliminary questions under Rule 104, 21A C.A. Wright & K.W. Graham, Jr., Federal Practice and Procedure: Evid. § 5055 (2d ed. 1987), particularly where the opponent does not seriously question the existence of the preliminary fact and "simply wants to force the proponent to jump through all the hoops." Id. at n.58.

---

[4] (Id., Ex. 11.)
[5] Motions in limine may be used to admit evidence prior to trial as well as to exclude evidence, and are heard by the district court pursuant to its inherent authority to manage trials. See, e.g., United States v. Davis, 826 F. Supp. 617, 620 (D.R.I. 1993).

8

**2. There Is More Than Sufficient Evidence Of Authenticity.** Under Rule 901(a), authenticity is established through evidence sufficient to support a finding that the matter in question is what the proponent claims it to be. See, e.g., United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997); United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994). With respect to authentication, the trial court serves a gatekeeping function. Once the trial judge determines there is enough support in the record to warrant a reasonable person to believe the evidence is what it purports to be, Rule 901(a) is satisfied. See, e.g., Paulino, 13 F.3d at 23.

The standard for authentication under Rule 901 is not demanding. Indeed, the courts have repeatedly termed to it "minimal." See, e.g., United States v. Cuesta, 597 F.2d 903, 915 (5th Cir. 1979); United States v. Reich, 2005 WL 1388967 at *3 (E.D.N.Y. 2005); see generally 31 C.A. Wright & V.J. Gold, Federal Practice and Procedure: Evid. § 7106 (2000). All that is required is a showing of a "reasonable likelihood" that the matter is what the proponent says it is. Alicea-Cardoza, 132 F.3d at 4. The proponent need not rule out all possibilities inconsistent with authenticity. Id.

Rule 901(b) lists a series of alternative, non-exclusive means of authentication, including (a) by the testimony of a witness with knowledge that a matter is what it is claimed to be, and (b) by reference to the distinctive characteristics of the evidence itself, such as its appearance, contents, substance, or internal patterns, taken in conjunction with circumstances. Fed. R. Evid. 901(b)(1) and (4). A custodian or percipient witness can authenticate a document. See, e.g., United States v. Mulinelli-Navas, 111 F.3d 983, 990 (1st Cir. 1997). Percipient witnesses include anyone who wrote, signed, used, or saw others writing, signing, or using a document. See generally 31 C.A. Wright & V.J. Gold, Federal Practice and Procedure: Evid. § 7106, citing Hal Roach Studios v. Richard Feiner and Co., 896 F.2d 1542, 1551 (9th Cir. 1990) (declaration of

corporate officer who was familiar with corporate registration document satisfied Rule 901(b)(1)), and United States v. Durham, 868 F.2d 1010, 1012 (8th Cir. 1989) (testimony by witnesses that copy of letter was accurate was sufficient under 901(b)(1) where they had read original).  In John Beaudette, Inc. v. Sentry Insurance, 94 F. Supp. 2d 77, 89 n.4 (D. Mass. 1999), for example, this Court relied in part on an averment in an attorney's affidavit in ruling that insurance policies had been authenticated.  In the affidavit, the attorney stated that he had received the original insurance policies and reviewed them at the time, and that the policies were in the same condition as the exhibit provided to the Court.  The Court also relied on the contents of the document pursuant to 901(b)(4), and on the fact that the documents had been kept in an attorney's office.  Id.

Paulino, which involved authentication pursuant to Rule 901(b)(4), is instructive.  There, it was held that the content of a document and the circumstances surrounding it were sufficient evidence of authenticity, despite the lack of testimony from either a custodian or a percipient witness.  The document in question, a receipt for a postal service money order marked as "May rent," was offered as evidence that the individual whose name appeared on the receipt had rented, for the month of May, the apartment the address of which was listed on the receipt.  The receipt was found in the apartment, to which the defendant alone had a key.  The document bore the defendant's name, listed the correct apartment number, and referred to a time frame during which the drug distribution for which the defendant was prosecuted occurred.  The circumstances, it was held, were sufficient to authenticate the receipt.  13 F.3d at 23-24.  See also United States v. Gordon, 634 F.2d 639, 643-44 (1st Cir. 1980); Gonzalez v. Digital Equipment Corp., 8 F. Supp. 2d 194, 196-97 (E.D.N.Y. 1998).

Even assuming that Mr. McKenna did not sufficiently authenticate his first report during his deposition, the James Affidavit, in conjunction with the distinctive characteristics of the two reports and other evidence, provide a basis for authentication that <u>far</u> exceeds the minimal requirements of Rule 901. Boston Gas raises no serious issue as to the veracity of Ms. James' identification of the reports; it simply points out that her affidavit is hearsay. This objection is not valid. Under the authority discussed above, the Court may rely on Ms. James's affidavit in ruling on the authenticity of the McKenna reports, particularly since Boston Gas is attempting to force Century to "jump through all the hoops."[6]

The James affidavit, standing alone, is sufficient to authenticate the McKenna reports under Rule 901(b)(1). Ms. James is a witness with the knowledge, and she provides sufficient evidence that the reports are what Century claims them to be. She explains that she was the paralegal in charge of maintaining all documents related to the litigation in which her firm retained Mr. McKenna. She explains that Mr. McKenna provided her firm with the two reports. She explains that the reports have been maintained in her firm's files since Mr. McKenna delivered them to the firm, and she provides true and correct copies of the reports. As her firm's official custodian of the files on the litigation, including Mr. McKenna's reports, Ms. James is a Rule 901(b)(1) witness, and she has sworn that the documents attached to her affidavit are Mr. McKenna's reports. She has authenticated them. <u>See, e.g.</u>, <u>John Beaudette, Inc.</u>, 94 F. Supp. 2d at 89 n.4.

If Ms. James's sworn statement were not enough, there are <u>multiple</u> facts, circumstances, and characteristics that are sufficient to authenticate under Rule 901(b)(4). Mr. McKenna testified that he did the work for Ms. James' firm, that he prepared at least one report for her

---

[6] To address Boston Gas's invalid objection, Century would be forced to fly Ms. James to Boston. Through this hoop Century and Ms. James should not be forced to jump.

11

firm, and that statements read to him from the report are accurate. Further, the reports have distinctive characteristics. They bear Mr. McKenna's name and address and are signed. His curriculum vitae is appended to the first report. The subject of the reports is the same as the subject to which Mr. McKenna was retained to opine, and the reports contain a wealth of information tying them to Mr. McKenna. The dates of the reports correspond to the time frame in which Mr. McKenna was retained to assist Ms. James' firm. The title of the First McKenna Report corroborates Ms. James' (and Mr. McKenna's) statements concerning the origin of the report. The Second McKenna report is related to the first and is in the form of a letter addressed to Ms. James' firm. Thus, Mr. McKenna's own testimony, coupled with the distinctive characteristics and content of the documents and the setting in which they were located and maintained, are sufficient evidence of authenticity under Rule 901(b)(4). See, e.g., Paulino, 13 F.3d at 23-24. Indeed, in view of the content and characteristics of, and facts and circumstances surrounding, the reports, it is inconceivable that they are not what Century says they are.

**B.      The McKenna Reports Are Admissible**

Century anticipates that Boston Gas will object to the McKenna reports on the ground that they are hearsay. The objection should be overruled.

**1. The McKenna Reports Are Not Hearsay.** The McKenna Reports are not hearsay because they are offered to show the knowledge or state of mind of Mr. McKenna in the 1950s and 1960s.[7] They go to the critical issue of when Boston Gas first knew or expected that it was contaminating the Everett site.

---

[7]Interestingly, because the important subject matter of the McKenna reports is state of knowledge in the 1950s and 1960s, at bar is a situation in which the subject of the evidence and the purpose for which it is offered are one in the same. Thus, while Century offers the reports to show knowledge, the truth of the assertions concerning knowledge also will be demonstrated. Century is not aware of any principal or authority that would render the reports inadmissible simply because the purpose for which the reports are being offered corresponds with the subject of the reports.

12

"Statements proffered to show something other than the accuracy of their contents – to show, say, the knowledge or state of mind of the declarant or one in conversation with him – are not considered hearsay." United States v. Figueroa, 818 F.2d 1020, 1026-27 (1st Cir. 1987). In Figueroa, the court of appeals upheld the admission of statements made by the defendant about counterfeiting, not as showing the truth of the statements, but as demonstrating the knowledge and sophistication of the defendant in the subject matter. In doing so, the court quoted McCormick on Evidence § 250 at 741 (3d ed. 1984): "Proof that one talks about a matter demonstrates on its face that he was conscious or aware of it, and veracity does not enter into the situation." Figueroa, 818 F.2d at 1027. Similarly, in Kassel v. Gannett Co., Inc., 875 F.2d 935, 945-46 (1st Cir. 1989), the court of appeals upheld the admission of portions of a board report, not to vouch for the conclusions reached, but to show the institutional state of mind of the Veteran's Administration and their motivation in attempting to terminate the plaintiff. See also Marsee v. U.S. Tobacco Co., 866 F.2d 319, 325-26 (10th Cir. 1989) (reports and articles on tobacco health problems admissible to show notice of potential dangers, not truth of the articles, therefore not hearsay).

The McKenna reports are offered to show, and do show, what Mr. McKenna and all "competent gas plant operators" were aware of in the 1950s and 1960s concerning the environmental hazard and effects of manufactured gas plants. More to the point, carefully read, the reports suggest, and are offered to prove, that at that time, Mr. McKenna (and thus Boston Gas) knew that, or knew that it was likely that, substantial quantities of tars and oils were present at the Everett site. As in Figueroa, the mere fact that Mr. McKenna made the statements in the reports demonstrates a considerable level of knowledge and sophistication in the 1950s and 1960s on the part of a high level Boston Gas executive relative to the likelihood, if not certainty,

13

of contamination. As in <u>Figueroa</u>, the reports should be admitted as non-hearsay evidence of knowledge.

**2. Even Assuming The Reports Are Hearsay, They Are Admissible**

**a. The Reports Are Admissible Under Rule 803(5).** The reports meet the requirements of the hearsay exception in Fed. R. Evid. 803(5) (past recollection recorded), which are that the witness once had personal knowledge of the matter, that the memorandum was prepared or adopted by him when the subject was fresh in his memory, that the memorandum accurately reflected his knowledge, and that he currently has insufficient recollection to enable him to testify fully and accurately. 30B M.H. Graham, <u>Federal Practice & Procedure: Evid.</u> § 7046 (2000). It is not necessary to establish that the witness has no independent recollection at all. It is sufficient that he lacks sufficient recollection to testify fully and accurately. <u>Id.</u> <u>See also</u> <u>Forbis v. McGinty</u>, 292 F. Supp. 2d 160, 162-63 (D. Me. 2003) (court ruled on motion *in limine*, that note by emergency room doctor relative to statement by patient was admissible under Rule 803(5)).[8]

There is no bright-line test for determining whether the subject matter was fresh in the mind of the witness at the time he made the record. <u>See, e.g.</u>, 30B M.H. Graham, <u>Federal Practice & Procedure: Evid.</u> § 7046 n.3 (2000) (noting cases in which periods of several months to three years have satisfied the rule); <u>United States v. Green</u>, 258 F.2d 683, 689 (7th Cir. 2001). The Advisory Committee Notes for Rule 803(5) state that no attempt is made to spell out the method of establishing initial knowledge or contemporaneousness and accuracy of the record, leaving the issue to be dealt with based on the circumstances of a particular case.

---

[8] The court used a preponderance of the evidence standard for evaluating the preliminary evidence, but noted that the standard should arguably be even lower, leaving the ultimate decision of the weight to the jury, citing <u>Paulino</u>. <u>Id.</u> at 162 n.2.

14

The deposition testimony of Mr. McKenna, coupled with the facts that he was a high level, long-term employee of Boston Gas who was in a position to know precisely the kind of information set forth in the report, provides the necessary foundation to permit the McKenna reports to be read into the record. As noted, Mr. McKenna was unable, due to a loss of memory, to testify fully and accurately at his deposition regarding the subject matter of the reports. The reports were created in 1992, approximately three years after he had left Boston Gas. At that time, the knowledge that he had acquired as a high level operations employee of Boston Gas was obviously fairly fresh in his mind, since he was able to set forth in the reports in great detail the various positions he had held and his responsibilities, as well as the time periods associated with each. He was also able to specify his knowledge as to oil and tar disposal issues, his recommendation to the president of Boston Gas, and his knowledge at various times of studies and knowledge in the field of manufactured gas operations. At issue here is not a note of a single fleeting conversation, the details of which may become blurred quickly. Instead, the reports relate to facts and knowledge, accumulated during a career at the highest levels of Boston Gas, concerning the very operations that were Mr. McKenna's responsibility. It is unlikely that he forgot the details of such a long and focused career at a single employer simply because two or three years have passed.

Mr. McKenna has also testified that everything in his reports is accurate. This affirmation of the accuracy of the contents of the reports is sufficient to meet the Rule 803(5) requirement that the record accurately reflect the witness's knowledge at the time. See, e.g., Parker v. Reda, 327 F.3d 211, 214 (2d Cir. 2003) (testimony that document correctly reflected knowledge at time of making the record was sufficient notwithstanding statement on cross examination that the witness did not remember writing the memorandum). In Forbis, for

example, the court admitted the document even without such a direct affirmation, relying on testimony that the doctor usually received the type of information contained in the record to establish it was more likely than not that the record was accurate. 292 F. Supp. 2d at 162-63. The Second McKenna Report was prepared under similar circumstances and for the same purpose as the first report, and as a result, there is every indication that it is accurate as well.

Any doubts that may have been created by the strenuous efforts of Boston Gas to coach and confuse the witness into attempting to evade the clear and unambiguous statements in the McKenna Report should be left to the jury to evaluate. Under the low threshold applicable to preliminary issues under Rule 104, such doubts should not prevent the admission of the evidence, particularly in light of Boston Gas's behavior. Given the clear language of the reports that indicates that they are based on personal knowledge, and the direct affirmation of the accuracy of the reports, neither the reports, nor any portion thereof, should be excluded on the recently-contrived contention that they are based only on a historical study conducted in 1992.

**b. The Reports Are Admissible Under Rule 807.** Alternatively, the Reports are admissible under Rule 807, the residual exception to the hearsay rule. Under Rule 807, a statement not covered by any other exception, but having equivalent circumstantial guarantees of trustworthiness, may be admitted if the court determines that the statement is offered as evidence of a material fact; the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts; and the general purposes of the rules of evidence and the interests of justice will be best served by its admission. There must also be advance notice to the opposing party of the intent to use the statement. Fed. R. Evid. 807; see, e.g., 30B M.H. Graham, Federal Practice & Procedure: Evid. § 7095 (2000); United States v. Nivica, 887 F.2d 1110, 1127 (1st Cir. 1989).

The trustworthiness inquiry is largely fact-driven, and the court may consider whether the evidence shares reliability factors common to other hearsay exceptions, such as personal knowledge and lack of bias, and whether the evidence would, but for a technicality, come within a specific exception. See, e.g., United States v. Trenkler, 61 F.3d 45, 57-58 (1st Cir. 1995). In Nivica, the court of appeals admitted certain bank records that otherwise failed to come within the business records exception, ruling that the evidence was material, trustworthy (given the absence of any indication they were other than what they purported to be), and the only evidence of banking activities in Mexico. 887 F.2d at 1127.

The McKenna reports are important evidence as to a key material fact, viz., the knowledge of Boston Gas in the 1950s and 1960s. They are more probative on that point than any other evidence possessed by Century, particularly since they directly relate to the personal knowledge of a key executive of the company in charge of the operations at issue.

The reports also are trustworthy. Mr. McKenna had no motivation to lie about the knowledge he had acquired at Boston Gas. See, e.g., Steinberg, M.D. v. Obstetrics-Gynecological & Infertility Group, P.C., 260 F. Supp. 2d 492, 496 (D. Conn. 2003) (letter trustworthy since no motive to fabricate or convey inaccurate information). Further, he testified that the first report is accurate, and it is logical to assume that in view of his position, he was privy to precisely the sort of information that he included in the reports. There has been advance notice of the intent to use the Reports, as evidenced by the prior discussions among the parties regarding their admissibility.

Finally, the interests of justice will best be served by the admission of the reports. The reports will provide the jury with a singular view of the true state of Boston Gas's knowledge during the critical years. Further, Boston Gas's counsel have engaged in a concerted effort, first

17

to hide the documents, then to deny their relevance, then to coach the witness to contradict the plain statements in the documents, and finally to thwart their admission in evidence.

The requirements for the application of the residual exception are satisfied with respect to the McKenna reports. While the residual exception to the hearsay rule is to be used "stintingly," Nivica, 887 F.2d at 1127, this case presents the unusual circumstance in which the use of Rule 807 is entirely appropriate.

## CONCLUSION

For the foregoing reasons, Century respectfully requests that the Court grant its motion *in limine* and admit the McKenna reports into evidence.

Respectfully submitted,

**HARE & CHAFFIN**

Dated: October 17, 2005

/s/David B. Chaffin
David B. Chaffin
BBO No. 549245
160 Federal Street
Boston, MA 02110
Phone: (617) 330-5000
Fax: (617) 330-1996

**WHITE AND WILLIAMS LLP**

Guy A. Cellucci
Shane R. Heskin
1800 One Liberty Place
Philadelphia, PA 19103-7395
Phone: (215) 864-7000
Fax: (215) 864-7123

**Attorneys for Defendant
Century Indemnity Company**

100061.1013