**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

BOSTON GAS COMPANY d/b/a KEYSPAN
ENERGY DELIVERY NEW ENGLAND,

          Plaintiff,

    v.

CENTURY INDEMNITY COMPANY,

          Defendant.

---

CENTURY INDEMNITY COMPANY,

          Third-Party Plaintiff,

    v.

ASSOCIATED ELECTRIC & GAS  INSURANCE
SERVICES LIMITED, et al.,

          Third-Party Defendants.

---

Civil Action
No. 02-12062RWZ

---

**DEFENDANT CENTURY INDEMITY COMPANY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE**
**CERTAIN EXPERT OPINION TESTIMONY OF NEIL S. SHIFRIN, Ph.D**

Century Indemnity Company ("Century") respectfully submits this Memorandum of Law

in support of its Motion *In Limine* to Preclude Certain Expert Opinion Testimony of Neil S.

Shifrin, Ph.D regarding (1) the timing of the alleged contamination at the Everett manufactured

gas plant ("Everett MGP" or "Everett Site") due to routine MGP operations and (2) the timing of

continuous and progressive contamination at the Everett Site.

# I.    SUMMARY OF ARGUMENT

The United States District Court for the Middle District of Florida recently issued an Order rejecting the very opinion testimony regarding the timing of contamination Dr. Shifrin attempts to offer on behalf of Boston Gas Company.  In response, Dr. Shifrin claims that the United States District Court Judge was wrong – not him.  As discussed below, the District Court's decision to reject Dr. Shifrin's testimony on the basis that it is "unreliable," "speculative" and has "no firm ground in science" was well reasoned, and in fact, required as a matter of law.  Accordingly, Dr. Shifrin's nearly identical testimony in this case should be rejected.

While Century widely expects that Boston Gas and its expert, Dr. Shifrin, will attempt to rewrite history and deny that the proffered opinions in this case are based on the same methodology recently rejected by United States District Court Judge Schlesinger, the record speaks for itself and is undeniable.  In that action:

> Plaintiff's designated expert, Dr. Neil Shifrin, testified that contamination is the unavoidable consequence of MGP operation and that he believes that the equipment used at the Saint Augustine plant leaked constantly throughout its operation.[1]

In reaching his opinion in the <u>Atlanta Gas Light</u> case above, Dr. Shifrin unmistakably relied upon the same flawed methodology he used to reach his opinions in this case.  To wit, in his expert report in this case, Dr. Shifrin states that his opinions on timing are based on the same general notion that:

---

[1] <u>See</u> <u>Atlanta Gas Light Co. v. UGI Utilities, Inc., et al</u>, Civil Action No. 03-00614-CV-J-20-MMH, order at p. 23 n.24 (M.D. Fla., Mar. 22, 2005), <u>appeal pending</u>, Docket No. 05-12204-FF (11th Cir. 2005) ( "<u>Atlanta Gas Light</u> Order"), annexed to the Declaration of Shane R. Heskin ("Heskin Decl."), dated October 17, 2005, as Exh. 1.

Equipment handling MGP tars or oils was likely to spring leaks from the day it was put into operation with new leaks arising from time to time thereafter . . . .[2]

The District Court correctly rejected this purported methodology and found Dr. Shifrin's opinions to be speculative and unreliable, with "no firm grounding in science." Atlanta Gas Light Order at 37 (noting that "[w]hile it is likely that the MGP equipment leaked at some time or at different times during its operation, without more than naked guesses as to time periods, no reasonable jury could find that contamination occurred during a specific one year period").

Boston Gas now intends to have Dr. Shifrin offer substantially the same opinion testimony in this case -- based upon the same flawed methodology highlighted in Atlanta Gas Light. As is demonstrated below, it is abundantly clear that Dr. Shifrin has not attempted to date the alleged occurrences of contamination at the Everett Site through any scientific method whatsoever. Importantly, Dr. Shifrin has not conducted any tests of his own, nor has he even visited the site. Dr. Shifrin bases his opinions purely on the observations of others. Tellingly, Boston Gas' own consultant, who made these first-hand observations for which Dr. Shifrin relies, claims that Dr. Shifrin's opinions are entirely speculative.[3] As such, not only is Dr. Shifrin's opinion testimony unreliable, but it is unlikely to assist the jury in understanding or determining any facts in issue during trial of this case. Accordingly, because the Court is obliged to determine whether an expert's opinion is based upon "good science" and not merely reliant upon flawed methodology, the Court, as "gatekeeper," should preclude Dr. Shifrin from offering opinion testimony as to the timing of alleged contamination at the Everett Site due to routine MGP operations. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 159 (1999) (Scalia, J.,

---

[2] Neil S. Shifrin, Ph.D., Amended Expert Report, Historical Practices and Environmental Conditions at Four Boston Gas Former MGPs: Commercial Point, South Boston, Braintree, & Everett ("Amended Expert Report"), vol. 1, at 91, annexed to the Heskin Decl. as Exh. 2.
[3] See James R. Greacen dep. at 79-81 (Jan. 7, 2005). The referenced excerpts from the transcript of Mr. Greacen's deposition testimony is annexed to the Heskin Decl. as Exh. 3.

concurring) (stating that factfinding process should not be distorted by "expertise that is *fausse* and science that is junky").

Secondly, the Court also should preclude Dr. Shifrin from offering testimony regarding his opinion that "contamination" at the Everett Site began since day one of operations and continued through today. As is demonstrated below, Dr. Shifrin not only utilizes unorthodox definitions for "contamination" and "continuous contamination" that render his opinions wholly without value in the context of this action, but he fails to demonstrate that any such "contamination" purportedly occurring <u>during</u> the Century policy period resulted in liability on the part of Boston Gas -- as required by the Century policies at issue in this action. Indeed, under Dr. Shifrin's definition of contamination, the introduction of <u>any</u> substance not naturally occurring, even if harmless, would constitute "contamination" and thereby a source of "continuous and progressive" contamination. Thus, according to Dr. Shifrin, contamination at the Everett site could have resulted during the Century policy periods from releases of innocuous substances that were never subject to remediation. Consequently, Dr. Shifrin's testimony regarding the existence and timing of "contamination" at the Everett Site is of no value to the fact finder because it does not prove any issues relevant to this case.

## II.    <u>STATEMENT OF FACTS</u>

### A.    <u>Nature of Action</u>

Boston Gas brings this action seeking a declaration that Century is jointly and severally liable for 100% of all environmental investigation and remediation costs it has incurred and will incur at twenty-eight separate former manufactured gas plant and gas holder sites and one former smelter facility (the "MGP Sites"). Boston Gas alleges that contamination at the MGP Sites

began from day one of operations from routine leaks and spills and continues through today as a result of progressive and ongoing contamination.

By its Answer, Century denies, among other things, that it is jointly and severally liable for 100% of these environmental costs. Specifically, Century denies that it is required to indemnify Boston Gas for any environmental costs arising from property damage that happened before or after the Century policy periods at issue. Century's expert, Richard Meehan, also opines that no contamination requiring remediation today occurred during the relevant Century policy periods.

**B.    The Everett Site**

The instant motion focuses solely on the Everett Site, which is set for trial on November 14, 2005. The Everett MGP operated from approximately 1908 to 1957, with peak shaving operations possibly continuing until 1960. On or about January 20, 1960, Eastern Gas and Fuel Associates and Boston Gas issued a press release stating that the Everett Plant would "discontinue operations April 30, 1960" and that Boston Gas would convert its operations to 100% natural gas by August 1960.[4] Accordingly, the date of last manufactured gas operations at the Everett Site was August 1960.[5]

The primary structures used during most of the operating life of the Everett MGP included: (1) gas holders, (2) tar storage tanks, (3) tar separators, (4) oil storage tanks, (5) gas purification facilities and (6) gas production facilities (retorts). At issue for purposes of this

---

[4] See Gas Plant In Everett To Shut Down, Boston Evening American (Jan. 20, 1960),annexed to the Heskin Decl. as Exh. 4.
[5] See id.

motion is Boston Gas' contention that contamination at the Everett Site began from day one of operations as a result of routine leaks and spills from former MGP operations.[6]

By late 1969, Boston Gas entered into a contract for the dismantling of the Everett Site. Dismantling operations began in February 1970. Soon thereafter, on March 30, 1970, Boston Gas sold the Everett Site to Distrigas of Massachusetts LLC ("DOMAC").[7] DOMAC took over responsibility for the dismantling of the Everett MGP and completed the dismantling process by the early 1970s.[8]

## C.    **Boston Gas Admissions**

In its Supplement to its Opposition to Century's Motion for Partial Summary Judgment on Late Notice for Everett ("Boston Gas Supplement to Opposition"), Boston Gas admits that in order for coverage to exist under the Century policies at issue in this case, Boston Gas must prove that any property damage that might have occurred <u>during</u> the Century policy period <u>resulted in liability to Boston Gas</u>.[9] Thus, the mere fact that property damage occurred during the policy period is insufficient to trigger liability. It must be property damage resulting in liability to Boston Gas. Which, in this case, is contamination resulting in or requiring remediation.

---

[6] Although not pertinent to the instant motion, and disputed by Century, Boston Gas also asserts that contamination at the Everett site was exacerbated by a fire in 1948, a catastrophic tar spill in 1962, and perhaps a second tar spill near the area of the former purifier boxes in approximately 1953.

[7] See Purchase and Sale Agreement between Eastern Gas Associates and Distrigas Corporation ("Distrigas"), dated March 30, 1970, annexed to the Heskin Decl. as Exh. 5.

[8] See Agreement between Distrigas and The Kaiser-Nelson Steel & Salvage Corp, dated March 13, 1970, annexed to the Heskin Decl. as Exh. 6.

[9] See Boston Gas Supplement to Opposition at 1 n.1, annexed to the Heskin Decl. as Exh. 7 ("Under Century's policies, notice was due only when Boston Gas knew of an occurrence that was likely to lead to liability in excess of the self-insured retention underlying the policies, based upon property damage that happened during the policy periods.").

### III.   THE LEGAL STANDARD

Federal Rule of Evidence 702 controls the admissibility of opinion or "expert" testimony. The rule provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts are guided in their determination of the admissibility of evidence under Rule 702 by the Supreme Court's decisions in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and Kumho Tire. "Under the holding of Daubert, a district court must act as a 'gatekeeper' by determining 'whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning properly can be applied to the facts in issue.'" Zachar v. Lee, 363 F.3d 70, 76 (1st Cir. 2004) (quoting Daubert, 509 U.S. at 592-93). "In Kumho Tire, the Court extended the reach of Daubert's gatekeeping function to cover all types of expert testimony involving technical or otherwise specialized knowledge." Id.

As "gatekeeper," the trial judge must determine if the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. In determining the reliability of the proffered testimony -- whether the expert's opinion is based upon "good science" and not reliant upon flawed methodology -- the court should consider whether the technique or methodology utilized by the expert has been tested and peer reviewed, as well as whether it is generally accepted by the scientific community. See id. at 595. Relevancy is determined not only under the general principles of Federal Rule of Evidence 402, "but also in the incremental sense that the expert's proposed opinion, if admitted, likely would

assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of

Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1988) (noting that Daubert "imposed a

special relevancy requirement"). The Supreme Court has provided useful guidance on this point:

> [C]onclusions and methodology are not entirely distinct from one another.
> Trained experts commonly extrapolate from existing data. But nothing in Daubert
> or the Federal Rules of Evidence requires a district court to admit opinion
> evidence that is connected to existing data only by the *ipse dixit* of the expert. A
> court may conclude that there is simply too great an analytical gap between the
> data and the opinion proffered.

General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Ruiz-Troche, 161 F.3d at 81

(stating that Joiner "placed a gloss on Daubert's insistence that trial courts focus on an expert's

methodology, rather that his conclusions, in order to determine the reliability of his testimony");

Smith v. General Elec. Co., 2004 WL 870832, at *3 (D. Mass. Apr. 23, 2004) (explaining that

Joiner provides "[t]he most authoritative guidance as to the meaning of this 'special relevancy

requirement'").

Here, as is shown below, there is no question that Dr. Shifrin's opinions as to the timing

of the alleged occurrences of contamination at the Everett Site due to routine MGP operations

are conjectures, at best. His bare assertions not only rest upon unqualified methodology, but are

founded upon a complete lack of data and therefore are incapable of verification. Moreover, the

very same flawed methodology and scientifically unsupported opinions regarding the timing of

contamination at MGP sites due to routine MGP operations was proffered – and rejected – in the

analogous Atlanta Gas Light case. There, the District Court found that Dr. Shifrin's opinions

regarding the timing of occurrences of contamination during MGP operations were speculative

and unreliable, and had "no firm grounding in science." Atlanta Gas Light Order at 37.

In addition, assumptions made by Dr. Shifrin with respect to the timing of contamination

at the Everett Site have no relevance to the issues in this case. In particular, Dr. Shifrin's stated

definitions of "contamination" and "continuous and progressive contamination," as used in this case, offer no value to an analysis of whether coverage under the Century policies was implicated in this case, especially where Dr. Shifrin fails to offer any testimony that such contamination either led to liability on the part of Boston Gas or is subject to remediation. Accordingly, the testimony should be excluded.

## IV.    ARGUMENT

**A.    Dr. Shifrin's Opinion Testimony Concerning The Timing Of The Alleged Occurrences Of Contamination At The Everett Site Due To Routine MGP Operations Is Speculative And Inherently Unreliable**

Boston Gas has the burden to establish that its expert's testimony is reliable. <u>See</u> <u>Daubert</u>, 509 U.S. at 597. This it cannot do, for while "[t]he court's assessment of reliability is flexible, [] 'an expert must vouchsafe the reliability of the data on which he relies and explain how the culmination of that data was consistent with standards of the expert's profession.'" <u>Zachar</u>, 363 F.3d at 76 (quoting <u>SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.</u>, 188 F.3d 11, 25 (1st Cir. 1999)). As is demonstrated below, the methodology underlying Dr. Shifrin's conjectures as to the timing of alleged contamination due to routine MGP operations at the Everett Site has no basis in science and recently (and specifically to Dr. Shifrin's use of that methodology) has been rejected as unreliable by the District Court for the Middle District of Florida. <u>See</u> <u>Atlanta Gas Light</u> Order at 37-38; <u>see also</u> <u>Kumho Tire</u>, 526 U.S. at 159 (Scalia, J., concurring) (factfinding process should not be distorted by "expertise that is *fausse* and science that is junky").

Dr. Shifrin's expert report and deposition testimony make it abundantly clear that he has not attempted to date the alleged contamination at the Everett Site through any scientific method. Although Dr. Shifrin opines that MPG leaks and spills essentially began when the Everett MGP

first began operation and continued throughout its operations, a review of his methodology -- as he explained in his deposition testimony -- elucidates the inescapable fact that Shifrin's "expert opinions" are based on nothing more than pure speculation and conjecture. Dr. Shifrin simply applies his own pet theories -- unsubstantiated by the scientific community -- and thereupon assumes that there were releases from the MGP equipment throughout their operable spans, and, more critically, during the periods insured by Century.

Moreover, the haphazard and speculative nature of these opinions is demonstrated by Dr. Shifrin's inconsistent and shifting testimony. He states in his expert report that "[e]quipment handling MGP tars or oils was likely to spring leaks from the day it was put into operation with new leaks arising from time to time thereafter . . . ."[10] He similarly implied[11] during his first day of deposition testimony that virtually all MGP equipment containing fluids leaked throughout its operational use, testifying as follows:

> Q.     You just used the word "could happen." What I want to know is, can you point to a specific piece of equipment at any of the sites and say definitively that piece of equipment had a leak and it began leaking on x date?
>
> A.     I can tell you with a high degree of scientific certainty that the equipment that handled the tar and other fluids leaked at least very near the onset of their installation and continued to leak thereafter--
>
> Q.     For each of the four sites?
>
> A.     -- for the entire time span.
>
> Q.     For each of the four sites?
>
> A.     Yes.[12]

---

[10] Amended Expert Report, vol. 1, at 91, annexed to the Heskin Decl. as Exh. 2.
[11] During his first day of deposition testimony, Dr. Shifrin merely noted that he had "seen some equipment that *appears* not to have leaked." See Neil S. Shifrin, Ph.D. dep. at 78-79 (Apr. 6, 2005). The referenced excerpts from the April 6, 2005 deposition of Dr. Shifrin are annexed to the Heskin. Decl. as Exh. 8.
[12] Id. at 106.

However, during his second day of deposition testimony, Dr. Shifrin quite significantly changed his testimony to aver that some tanks, indeed, never did leak:

> Q.   When did steel bottom tank holders begin to leak?
>
> A.   They could have leaked as soon as they were put in.  Some of them never leaked, but the ones that leaked could have leaked as soon as they were put in.
>
> Q.   Is that based on any scientific degree of certainty -- could have leaked?
>
> A.   At this point it's more useful to look at the sites themselves to look at the ones that did leak and we could talk about those.
>
> Q.   I just want to talk about steel gas holder tanks right now.  We were talking about steel tanks that were installed.  What's your view as to when those holders would have began to leak?
>
> A.   The ones that have leaked could have begun leaking from their first date of installation.[13]

Moreover, Dr. Shifrin's conclusions -- asserted entirely without site-specific facts or documentation -- regarding the "likely" leakage of tanks and equipment used at MGP sites are so imprecise as to be completely without value to the fact finder.  For instance, Dr. Shifrin testifies at various times that MGP equipment may have begun to leak from the day of installation, or a day, week or month thereafter, or a decade thereafter, or seventeen years thereafter, or never.  Dr. Shifrin's deposition testimony on this point is as follows:

> Q.   Okay.  In your view when do steel bottom gas holders begin to leak?
>
> Mr. Elkind:   Objection.  Incomplete hypothetical.
>
> A.   Steel bottom holders that did leak are likely to have leaked from the day they were put in.
>
> Q.   To a scientific degree of certainty from day one.

---

[13] Neil S. Shifrin, Ph.D. dep. at 75-76 (Apr. 7, 2005).  The referenced excerpts from the April 7, 2005 deposition of Dr. Shifrin are annexed to the Heskin. Decl. as Exh. 9.

A.    To a scientific degree of certainty either from day one, more or less, or within approximately a decade.

Q.    Isn't it true that it could be longer than a decade in which the steel construction began to leak?

A.    For the ones that leaked?

Q.    Yes.

A.    It's possible.

Q.    Is there any way of telling?

A.    Well, we have the EPA study in 1992 that looked at steel tanks and the average period of leakage is, I believe, 17 years.

Q.    But some of them never leaked, correct?

A.    I actually think that study concludes that at some point in time they all leak. The average is 17 years.

Q.    But if they haven't leaked -- you already testified that there are some that never leak, correct?

A.    Did I say that? Oh yeah, there are some that don't leak, yeah.[14]

Moreover, Dr. Shifrin makes no pretense of the fact that he merely guesses at the likely times in their operational lives that MGP equipment at any specific Boston Gas site might have leaked:

Q.    And can we agree that at the sites at issue here you can't testify or identify the exact year or date in which a particular steel gas holder leaked?

A.    I can give you a time span.

Q.    And the time span is from day one until any time up to the time it was discovered?

A.    Until it was emptied.

Q.    And that's the time period. It could have leaked at any time in between that?

---

[14] Shifrin dep. at 76-77 (Apr. 7, 2005), annexed to the Heskin Decl. as Exh. 9.

A.    Or at all times.

Q.    One or the other.

A.    Yeah, one or the other.[15]

Given this telling testimony, it is clear that Schifrin's opinions on this topic add no value

to the fact finder's evaluation of the issue of when and if releases of contaminants occurred

during any particular one-year period.  Indeed, this precise conclusion was reached by the

District Court for the District of Florida, where, after considering comparable "expert"

testimony[16] proposed by Dr. Shifrin, Judge Schlesinger rejected that testimony as speculative and

unreliable.  Judge Schlesinger agreed with the defense expert's testimony that "Dr. Shifrin's

method of determining the source of contamination at the Saint Augustine Plant is far too

speculative and has no firm grounding in science." Atlanta Gas Light Order at 37.  Accordingly,

the District Court found that "[w]hile it is likely that the MGP's equipment leaked at some time

or at different times during its operation, without more than naked guesses as to time periods, no

reasonable jury could find that contamination occurred during a specific one year period." Id. at

37-38.

Accordingly, as in Atlanta Gas Light, the Court here should follow the dictates of

Daubert and exercise its "gatekeeping" function to disallow "expert" testimony unfettered with

scientific gravitas, especially where Shifrin's conclusions regarding when he believes MGP tanks

and equipment at the Everett Site may have leaked -- or not -- are based on the following:

Q.    All right.  And what's your scientific basis for that conclusion?

---

[15] Id. at 78.

[16] In that case, Shifrin testified in his deposition that "contamination is the unavoidable consequence of MGP operation and that he believes that the equipment used at the Saint Augustine plant leaked constantly throughout its operation." See Atlanta Gas Light Order at 23 n.24, annexed to the Heskin Decl. as Exh. 1. Also in that case, Shifrin testified that "he did not know, nor is there any way to know, at what time equipment began leaking, how long it leaked, or at what rate is leaked." Id. at 37.

A.     We have been through this like three times.  The scientific basis is -- for one is that EPA study on steel tanks.

Q.     Is that it?

A.     And the MGP literature that discusses leaks.  Scanty as it is, it still has papers that discuss leaks.

Q.     Okay.  So it's the EPA studies and the MGP literature.  That's what you make your basis on?

A.     And whatever else I might think of at some other point, but I can't remember now.  Those are two pretty good areas of support.[17]

Daubert instructs that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." 509 U.S. at 590.  It is eminently clear that Dr. Shifrin utilizes methodology that is not scientific and promotes conclusions that clearly are not based upon knowledge.  Accordingly, Dr. Shifrin should be precluded from testifying as to the timing of alleged occurrences of contamination at the Everett Site due to routine MGP operations.

**B.     Shifrin's Proposed Opinion Testimony Concerning The Timing Of Contamination At The Everett Site Is Irrelevant To The Issues In This Case**

The Court should preclude Dr. Shifrin from opining as to the existence of "contamination" or "continuous and progressive" contamination at the Everett Site because Dr. Shifrin's stated definitions  of those terms renders his testimony concerning contamination at the site without value to any issue in this case.[18]  As Boston Gas admits, the Century policies only provide potential coverage for "property damage that happened during the policy periods" and which results in liability to Boston Gas.[19]  Dr. Shifrin's theories of "contamination" shed no light on this issue.  Indeed, Dr. Shifrin's definition of  "contamination" not only has no scientific certainty, but it encompasses, for example, the release of innocuous contaminants into the

---

[17] Shifrin dep. at 78-79 (Apr. 7, 2005), annexed to the Heskin Decl. as Exh. 9.
[18] Such testimony is especially speculative after Everett MGP operations ceased on April 30, 1960.
[19] See Boston Gas Supplement to Opposition 1, n.1, annexed to the Heskin Decl. as Exh. 7.

environment. Likewise, Dr. Shifrin's definition of "continuous and progressive contamination" includes releases of new media into the environment even if the concentration levels are diminishing over time and not requiring remediation. Neither term, as defined by Dr. Shifrin, adds any value to an analysis of whether and when coverage was implicated under the Century policies. Moreover, Shifrin has failed to identify any contamination occurring during the Century policy periods that remains today. Shifrin has failed to identify any "continuous or progressive" contamination occurring during the Century policies that led to any liability on the part of Boston Gas or is subject to remediation. Finally, Dr. Shifrin has failed to identify any "continuous or progressive" contamination occurring during the Century policies that had any impact at all on remediation required at the site.

Accordingly, Dr. Shifrin's proposed testimony regarding the existence of "continuous and progressive" contamination at the Everett Site, especially after operations at the plant ceased in 1960, has no relevance to any issue to be tried in the case, and should be precluded. See Joiner, 522 U.S. at 146 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); Ruiz-Troche, 161 F.3d at 81 (stating that relevancy is determined by whether "the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue"). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Here, the "analytical gap" identified in Joiner is, in reality, a gaping hole. Accordingly, as is expanded below, Dr. Shifrin should be precluded from offering opinion testimony regarding his unorthodox theories of contamination at the Everett Site, which serve no probative value to any issue in this case.

1.    **Dr. Shifrin's Proposed Testimony Utilizing His Definition of
      "Contamination" Is Irrelevant To Any Issue In This Case**

Dr. Shifrin has testified that he defines "contamination" as "chemical concentrations in

environmental media that are above background levels, either ambient or anthroprogenic." His

deposition testimony on this topic reads, in pertinent part, as follows:

> Q.    I guess this is as good a time as any. What's your definition of
>       contamination as used in this case?
>
> A.    It varies. It evolves. That's the point. That what we view was
>       contamination today is not what was viewed as contamination thirty years
>       ago, fifty years ago, or a hundred years ago. And there's many reasons for
>       that.
>
> Q.    Let's start with today.
>
> A.    Okay.
>
> Q.    How do you define contamination in today's terms?
>
> A.    I would define it and recognize that there are different angles on this that
>       people might take exception to, but I would define it as chemical
>       concentrations in environmental media that are above background levels,
>       either ambient or anthroprogenic. But you must recognize that there are
>       other nuances to that, that others might want to emphasize. For example, a
>       regulator might want a slightly different definition of that. But
>       scientifically, that's how I would describe it.
>
>                   * * *
>
> Q.    What do you mean by "ambient"?
>
> A.    Naturally occurring.
>
> Q.    What do you mean by anthroprogenic? Did I get that right?
>
> A.    Yes. Anthroprogenic means made by man, but in the context of
>       background contamination for many chemicals there is a worldwide level
>       of chemical concentration formed by manmade activities that is still
>       viewed as background in today's world.[20]

---

[20] Shifrin dep. at 84-85 (Apr. 6, 2005), annexed to the Heskin Decl. as Exh. 8.

Even more troubling, however, is Shifrin's elaboration of his understanding of the term "contamination," as used in this case:

> Q.    And so using that definition, it could be above background and harmless and in your view that's contamination still?
>
> A.    By the definition that I gave you.
>
>        * * *
>
> Q.    Under your definition there can be contamination without any remedial implication, then, correct?
>
> A.    That's correct.[21]

Boston Gas proposes to offer Shifrin's testimony in this case for the purpose of establishing that contamination occurred at the Everett Site during the coverage period of the Century policies. However, because Boston Gas admits that the policies only are implicated where it is proved that the contamination resulted in property damage for which Boston Gas is liable, any testimony based upon a definition of "contamination" that includes the release of innocuous substances or those without remedial implication necessarily are irrelevant to the parties' dispute before this Court.

### 2.    Dr. Shifrin's Proposed Testimony Utilizing His Definition of "Continuous And Progressive Contamination" Is Irrelevant To Any Issue In This Case

Dr. Shifrin claims that "continuous and progressive" contamination has occurred at the Everett Site since day one of operations as a result of ongoing sources of contamination. Dr. Shifrin's definition of his these terms, however, renders any testimony irrelevant to the issues to be decided by the fact finder in this case. Dr. Shifrin's deposition testimony regarding these terms is as follows:

---

[21] Id. at 96, 99.

Continuous and Progressive Contamination

Q.   Let's go to area 7 of your report.

A.   You mean Chapter 7.

Q.   Chapter 7, I'm sorry.  When you use the word contamination -- timing and progressiveness of the contamination in Chapter 7, you are referring to the definition of contamination that you used -- you defined earlier, correct?

A.   Well, it certainly includes that.

Q.   What do you mean by contamination as used in this chapter?

A.   You can say it was consistent with what I said yesterday.

Q.   So when you used the word contamination here it may not necessarily be deleterious contamination, correct?

A.   Well, it may or may not be contamination that requires remediation.

Q.   Okay.  Do you identify in here -- do you make that distinction in this chapter?

     MR. ELKIND:  What distinction?

Q.   . . . [B]etween contamination which may be innocuous and contamination that requires remediation?  Do you make that distinction in here?

A.   I don't think I did.[22]

Ongoing Source of Contamination

Q.       What's your definition of an ongoing source of contamination?

A.       A zone or a material that continues to donate new contamination to environmental media.

Q.       Under your definition, then, it's possible that you would consider something to be a continuing source of contamination if it was introduce into new media into the environment even if the concentration levels are not increasing over time?

---

[22] Shifrin dep. at 202-203 (Apr. 7, 2005), annexed to the Heskin Decl. as Exh. 9.

A.    Certainly, yes.  That's what we call steady state.

Q.    Under your definition there could be an ongoing source of
contamination even if the levels are diminishing over time, then,
correct, theoretically?

A.    Yes.

Q.    Under your definition of ongoing source of contamination, there
can be an ongoing source of contamination without any
environmental impact, then, correct?

A.    It depends on what you mean by environmental impact.

Q.    Remediation requirement.  Remediation impact.

A.    It's possible that concentrations are created that are below
regulatory limits requiring remediation, yes.

Q.    Do you understand how ongoing source of contamination is
defined under the MCP?

A.    I don't remember specifically what they say about that.[23]

Given this testimony, it is clear that Dr. Schifrin's analysis of any alleged continuous and

progressive contamination at the Everett Site is based on his own pet theories and not on any

regulatory or generally accepted scientific principles.  Thus, his opinions add no value to a

determination of whether any such contamination implicated coverage under the Century

policies.  Accordingly, any such testimony on the part of Dr. Shifrin should be precluded.

## V.    CONCLUSION

For the foregoing reasons, Century respectfully request that the Court grant its Motion *In

Limine* and preclude plaintiff's expert, Neil S. Shifrin, Ph.D, from testifying as to:  (1) the timing

of the alleged contamination due to routine MGP operations at the Everett Site; and (2) the

timing of "contamination" and "continuous and progressive" contamination at the Everett Site.

---

[23] See Shifrin dep. at 99-100 (Apr. 6, 2005), annexed to the Heskin Decl. as Exh. 8.

Respectfully submitted,

**HARE & CHAFFIN**

Dated: October 17, 2005

/s/David B. Chaffin
David B. Chaffin
BBO No. 549245
160 Federal Street
Boston, MA  02110
Phone: (617) 330-5000
Fax: (617) 330-1996

**WHITE AND WILLIAMS LLP**

Guy A. Cellucci
Shane R. Heskin
1800 One Liberty Place
Philadelphia, PA  19103-7395
Phone: (215) 864-7000
Fax: (215) 864-7123

**Attorneys for Defendant**
**Century Indemnity Company**

20