UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON GAS COMPANY d/b/a NATIONAL GRID, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) )   C.A. No. 02-12062PBS |
| CENTURY INDEMNITY COMPANY, et al., | ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE*
TO EXCLUDE EXPERT TESTIMONY BY CHARLES K. ANDERSON**

Plaintiff, Boston Gas Company ("Boston Gas"), submits this memorandum in support of

its motion *in limine* to exclude the testimony of Charles K. Anderson ("Mr. Anderson"),

designated as an expert by Defendant Century Indemnity Company ("Century"). Century has

offered Mr. Anderson as an expert on several topics, including (1) the timing of the contamination

that Boston Gas had to remediate at the Everett site (the "timing" issue); (2) whether "remedial

measures [concerning the High Pressure Expansion Project] were conducted to address soil or

groundwater impacts" (Century's "owned property" exclusion argument); and (3) quantification of

"past expenditures related to remedial response measures, including investigation and remediation

related activities" ("cost analysis").[1]  Mr. Anderson's opinions violate Federal Rule of Evidence

702, which permits a qualified expert to testify only if the testimony would help the jury

understand issues in dispute, and

> if (1) the testimony is based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

---

[1] *See* Expert Opinions of Charles K. Anderson, October 1, 2010, at 2, Ex. 1 ("Anderson Op.").

DSMDB-2863686v8

Contrary to these requirements, Mr. Anderson's opinions consist of *ipse dixit* assertions that are refuted by the facts of this case, including facts validated by Century's other expert, Robert Atwood. Mr. Anderson's analyses and opinions also are not based on reliable principles or methodology:

♦ For timing, Mr. Anderson failed to perform any analysis or calculation of the data and facts related to specific contamination events during the operation of the Everett MGP, and instead simply pronounced that the contamination is "unfilterable," and thus applied the presumption urged by Century's counsel that contamination should be equally attributed to every year from 1908 to the 1990s/2000s;

♦ Mr. Anderson also concedes that his "timing" opinions are not susceptible to an independent review and replication to test his conclusions. Mr. Anderson instead glibly suggests that to test his conclusions, an independent observer should just obtain a second opinion and see if another expert agrees or disagrees with him[2] – notwithstanding the fact that replication and testing are the hallmarks of reliable principles and methodology under Rule 702;[3]

♦ On the owned property issue, Mr. Anderson ignores the universally accepted science regarding the relationship between soil contamination and groundwater contamination.[4] He also purposefully ignores the facts of this

---

[2] November 18, 2010 Dep. Tr. of C. Anderson at 185:16-187:14, Ex. 2.

[3] *United States v. Green*, 405 F. Supp. 2d 104, 120-21 (D. Mass 2005) (prohibiting an expert from offering conclusions because, *inter alia*, it would be difficult, if not impossible, for another expert to reproduce the results and stating: "[r]eproducibility is an essential component of scientific reliability"); *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 213 (D. Mass. 2009) (expert precluded from testifying because, among other reasons, "[h]is judgments about what is and what is not a sham process are value judgments that cannot be reviewed; they are simply his conclusions, *ipse dixit*").

[4] Groundwater is nothing more than water in the soil, including a zone of water that saturates the soil and fills all of the pores in the soil. April 8, 2005 Dep. Tr. of C. Anderson at 72:1-74:1, Ex. 3. Mr. Anderson attempts to separate groundwater contamination from soil contamination, which is contrary to the scientific relationship between soil contamination and groundwater contamination. *Id.* at 79:1-80:7; *see also* November 5, 2010 Dep. Tr. of R. Atwood at 152:6-13, 165:6-12, Ex. 4 (discussing NAPL contamination in soil of HPEP area that would contact groundwater and operate as a continuing source of contamination); *Characterizing Risks Posed by Petroleum Contaminated Site*, Commonwealth of Massachusetts Department of Environmental Protection, at 4.7, Ex. 5 (addressing, among other things, "NAPL acting as a continuing source of soil, groundwater, and/or soil gas contamination"). The relationship between soil and groundwater contamination has been explicitly recognized by the Massachusetts decisions addressing the owned property exclusion, which hold that soil removal to protect groundwater is not barred by the owned property exclusion. *See e.g.*, *Hakim v. Mass. Insurers' Insolvency Fund*, 675 N.E.2d 1161, 1164

case — that Century's other expert admits — that 171,348 gallons of groundwater were remediated, and that 110 barrels of liquids and resins were remediated to protect groundwater and surface water.[5] He instead applies the unsupported fallacy that no groundwater was remediated during the High Pressure Expansion Project ("HPEP") and that "there's no soil on the site ongoing that has a relationship to groundwater";[6] and

♦    Finally, Mr. Anderson concedes that his cost analysis is simply his view of an "equitable allocation, and that's what we have done here,"[7] and that his apportionment of costs into categories dictated by Century's counsel represents his judgment calls "as to where [he] felt that cost belonged."[8] Mr. Anderson's notions of equity and judgment calls are not subjects for expert testimony and are irrelevant.

The requirements of Rule 702 are wholly absent from Mr. Anderson's analyses and opinions.

In addition, Mr. Anderson renders opinions on issues beyond the scope of the First Circuit's remand that would confuse the jury by injecting irrelevant issues into the trial.  Mr. Anderson performs a past cost analysis to apportion costs into categories that have nothing to do with the two issues for the retrial, which are (1) the amount of Boston Gas liability for damages that resulted from property damage caused during the Century policy years (i.e., the "timing" of contamination for which Boston Gas has been held liable); and (2) whether any part of $3.5 million in damages awarded at trial should have been excluded due to the owned property exclusion, which is set forth in the First Circuit's 2008 decision.[9]  The injection of Mr. Anderson's

---

(Mass. 1997); *Rubenstein v. Royal Ins. Co. of Am.*, 694 N.E.2d 381, 389 (Mass. App. Ct. 1998), *aff'd on other grounds*, 708 N.E.2d 639 (Mass. 1999); *Preferred Mut. Ins. Co. v. Gordon*, No. 02-3147, 2003 WL 21077026, at *11-14 (Mass. Super. Ct. May 13, 2003) (Brassard, J.); *Wasserman v. Commerce Ins. Co.*, 15 Mass. L. Rptr. 170, 2002 WL 31187681, at *7-8 (Mass. Super. Ct. July 9, 2002) (Sanders, J.).

[5] November 18, 2010 Dep. Tr. of C. Anderson at 217:19-228:9, Ex. 2.

[6] *Id.* at 262:23-263:20.

[7] *Id.* at 255:13-257:8.  Mr. Anderson's conclusions demonstrate that his concept of equity and his judgment calls inure to the complete benefit of Century's litigation positions.  These notions of equity and speculative judgment calls are not bases for expert opinion. *See Green*, 405 F. Supp. 2d at 120-21; *Tuli*, 592 F. Supp. 2d at 213.

[8] November 18, 2010 Dep. Tr. of C. Anderson at 255:13-257:8, Ex. 2.

[9] The First Circuit's judgment also included two other issues for retrial:  (a) whether the missing policy contains a self-insured retention ("SIR"); (b) whether the missing policy contains an "owned property exclusion."  The first issue is of only modest importance.  Boston Gas has conceded the second issue.  Century also has a pending motion for a new trial on the intentional

irrelevant cost analysis would confuse, not help, the jury, and thus the cost analysis opinions fail the threshold for helpfulness.

Mr. Anderson's testimony does not meet the requirements for admissible expert testimony and should be precluded from the upcoming Everett trial.

## BACKGROUND

### MR. ANDERSON HAS SERVED MANY ROLES FOR CENTURY

In every instance, Mr. Anderson's opinions result in an arbitrary conclusion that benefits Century. This is nothing new. Years before being designated as an "independent" expert witness for Century in this case,[10] counsel for Century hired Mr. Anderson to advise them in negotiations with Boston Gas. In November 2004, Century then hired Mr. Anderson to opine on Boston Gas' past costs by placing them into "bins" devised by Century's counsel. Because contaminated groundwater is presumed in Massachusetts to flow to surface water, Century's goal was to minimize groundwater expenditures to further its owned property exclusion argument, even though groundwater exists in soil and flows through soil. Mr. Anderson opined that only $12,000 of $6.2 million spent at the Everett site was related to the protection of groundwater.[11] It was

---

damage issue (*see* PACER #627) (which Century's motions have termed "expected or intended") — that issue was not part of the remand from the First Circuit. Mr. Anderson's opinions do not relate to, and in fact contradicts, Century's intentional damage argument.

[10] "[A]n expert is supposed to be a professional, bringing an independent evaluation to the facts at hand. He is not merely a mouthpiece of the parties." *Soitec, S.A. v. Silicon Genesis Corp.*, No. 99-10826-NG, 2002 WL 34453284, at *1 n.2 (D. Mass. Feb. 25, 2002). Mr. Anderson's long-standing ties with Century have transformed him into an advocate for Century's defense theories, which was demonstrated during the November 18, 2010 deposition. For example, in response to Boston Gas' straightforward questions that probed Mr. Anderson's opinions on the length of the contamination at the Everett site, Mr. Anderson attempted to turn straightforward questions into a "Who's on first" routine. November 18, 2010 Dep. Tr. of C. Anderson at 85:15-91:12, Ex. 2. At the request of Mr. Anderson and Century, *id.* at 90:19-20, Boston Gas proceeded to inquire about timing based on particular areas of the site. After taking this time-consuming approach, however, the deposition revealed that Mr. Anderson had no different "timing" opinions for the various areas of the site. According to Mr. Anderson, the contamination in all areas was "unfilterable" and thus he assumes contamination from 1908 to the 1990s/2000s remediation. *Id.* at 120:10-22, 177:1-16.

[11] December 1, 2005 Trial Tr. at 55:1-23, Ex. 6.

DSMDB-2863686v8

Century's theory that all of the $6.2 million, other than the $12,000, was barred by the owned property exclusion. Mr. Anderson's opinion, however, was contrary to the facts, the well-understood scientific relationship between contaminated soil and contaminated groundwater, and Massachusetts law regarding the owned property exclusion. Judge Zobel was dubious of the relevance of Mr. Anderson's opinions, and explained to the jury the Court's "gate-keeping" function under *Daubert*:

> I think I would allow the witness to testify for the moment, but I may end up striking it if I determine that it isn't appropriate. At the moment I don't think it is appropriate, but I will allow you to put it in and the jury will determine . . . .[12]

Century turned again to Mr. Anderson for expert testimony in 2007 in connection with the Commercial Point site trial, and one area of his opinion focused on "timing of contamination."[13] For that site, it was Century's goal to argue that all contamination ended before its policy periods, 1951-1969. In that report, Mr. Anderson thus opined that "migration of contaminants [at the Commercial Point site] would have ceased within a few years following shutdown of operation in 1930."[14] The jury rejected this position, finding that property damage happened during each of Century's policy years (1951-1969), well after the end of plant operations, because of the evidence of continued migration of contaminants.

For the retrial of the issues remanded by the First Circuit concerning the Everett site, Century again has turned to its reliable advocate, Mr. Anderson, to provide opinions concerning his past cost analysis, again in an attempt to separate soil remediation from the protection of groundwater. Mr. Anderson now opines that $900,000 (not $12,000 as he previously testified) in total was spent at the Everett site to protect groundwater/surface water. According to

---

[12] *Id.* at 42:8-45:20.

[13] *See* excerpt from 2006 Expert Report by Mr. Anderson for Commercial Point site, at 1, 5, Ex. 7.

[14] This opinion dove-tailed perfectly with Century's position at the time that there was not continuing migration of contaminants, because such an opinion would have resulted in Century's responsibility for all cleanup costs under the prevailing allocation law in Massachusetts.

Mr. Anderson's report, no groundwater was remediated during the High Pressure Expansion Project that is the subject of the remand on the owned property exclusion.  Mr. Anderson was contradicted by Century's other expert, Robert Atwood, who testified that 171,348 gallons of groundwater from the HPEP area were remediated.[15]  After Mr. Atwood's deposition, Mr. Anderson had to concede this fact was accurate.[16]

Mr. Anderson also now opines on the timing of contamination at the Everett MGP. Although he recognizes that contamination occurred at various points in time, including from specific events, and that contamination was not equal throughout the years, he asserts with no analysis that it is impossible to draw any conclusion other than say that contamination started in 1908 and ended when the remediation occurred in the 1990s and early 2000s, which provides the most advantageous outcome for Century's allocation argument.  Mr. Anderson essentially presents the verbatim argument of Century's counsel.

Mr. Anderson's opinions are nothing more than *ipse dixit* pronouncements and are not based on the facts nor on any reliable methodology.  He produced not one page of work product to support his timing and owned property assertions.  The Court should not permit Mr. Anderson to imbue the arguments of counsel with the imprimatur of expertise, and to serve yet another role – testifying advocate – for Century.

---

[15]  November 5, 2010 Dep. Tr. of R. Atwood at 96:17-97:3, 102:9-103:20, 139:1-140:14, Ex. 4.
[16]  November 18, 2010 Dep. Tr. of C. Anderson at 219:2-21, Ex. 2.

DSMDB-2863686v8

**ARGUMENT**

LEGAL STANDARD

Rule of Evidence 702, which was amended in 2000 to conform to the U.S. Supreme

Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and

to the many cases applying *Daubert*, governs the admissibility of expert testimony. Pursuant to

the Supreme Court's holding in *Daubert*, "a district court must act as a 'gatekeeper' by

determining 'whether the reasoning or methodology underlying the testimony is . . . valid and

whether that reasoning can be applied to the facts in issue.'" *Zachar v. Lee*, 363 F.3d 70, 76

(1st Cir. 2004) (alteration in original) (quoting *Daubert*, 509 U.S. at 592-93).

*Daubert* set forth a non-exclusive list of factors for assessing the reliability of scientific

expert testimony:  (1) whether the expert's method, technique, or theory can be or has been tested;

(2) whether it has been subjected to peer review and publication; (3) its known or potential rate of

error; (4) the existence and maintenance of standards and controls; and (5) whether the technique

or theory has been generally accepted in the scientific community. 509 U.S. at 593-95. Mr.

Anderson's opinions do not meet that standard.

An expert cannot merely make *ipse dixit* pronouncements without a factual basis. Rather,

an expert's testimony also must rest on a reliable foundation, and be relevant to the issue at hand.

In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Supreme Court said:

> Trained experts commonly extrapolate from existing data. But nothing in
> either *Daubert* or the Federal Rules of Evidence requires a district court to
> admit opinion evidence that is connected to existing data only by the *ipse
> dixit* of the expert. A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered.

The First Circuit similarly has found that "'unfounded extrapolation'" from the data is properly

excluded. *United States v. Giambro*, 544 F.3d 26, 33 (1st Cir. 2008) (affirming finding that

general conclusion based on purported statistical analysis of "'purely anecdotal'" evidence is

properly excluded as "'unfounded extrapolation'"); *United States v. 33.92356 Acres of Land*,

DSMDB-2863686v8

585 F.3d 1, 6 (1st Cir. 2009) (upholding district court's exclusion of expert testimony that was

"'not supported'" and "'contrary to existing facts'"); *see also Riani v. Louisville Ladder, Inc.*,

No. 07-40258-FDS, 2010 WL 2802040, at *6 (D. Mass. July 14, 2010) (excluding expert

testimony based on assumption of permanent disability and stating that "[a]n expert cannot render

an opinion that is based on an incorrect factual premise or an assumption as to which there is no

evidence"). Mr. Anderson's views suffer from all of these defects.

I.      MR. ANDERSON'S OPINION ON THE TIMING ISSUE IS NOT GROUNDED
        IN THE FACTS AND IS NOT RELIABLE

Boston Gas will present, and the jury will be required to assess, complex facts regarding

contamination caused as a result of MGP operations and multiple discrete events that caused

property damage at the HPEP during Century's policy years.[17] Expert testimony greatly will assist

the jury in resolving this complex factual issue. Mr. Anderson should not be permitted to testify

regarding the timing issue, because he simply makes *ipse dixit* pronouncements, ignores critical

evidence, and has not performed any reliable analysis of this issue.

Even assuming he is qualified to testify on the timing issue,[18] his testimony consists of

unfounded extrapolation that is not the product of reliable principles or methodology but merely

sets forth Century's best argument. Mr. Anderson's report sets forth no methodology to support

any determination of when contamination happened at the Everett MGP. Mr. Anderson's report

offers unsubstantiated conclusory opinions regarding the timing of contamination, such as:

---

[17] The Massachusetts Supreme Judicial Court in *Boston Gas Co. v. Century Indemnity Co.*,
910 N.E.2d 290, 312 (Mass. 2009), describes the "ideal method" of allocation as a "'fact-based'
allocation" that identifies the precise amounts of liability attributable to the specific policy periods.
Thus, the critical factual inquiry for the jury related to timing is whether the evidence permits an
accurate estimation of the amount of property damage for which Boston Gas has been held liable
that occurred at the Everett MGP during Century's policy years.

[18] Mr. Anderson has dubious qualifications to testify regarding the contamination caused by MGP
operations. Mr. Anderson readily admits that he is not an expert regarding MGPs. November 18,
2010 Dep. Tr. of C. Anderson at 44:14-24, Ex. 2. Nor is he an expert on the Massachusetts
Contingency Plan that has dictated Boston Gas' environmental response, and mandated the
cleanup at the site. *Id.* at 36:14-19.

DSMDB-2863686v8

♦   "[I]t is likely that contamination in the [HPEP] area began soon
    after commencement of Everett plant operations in 1908" (no
    end date provided);[19] and

♦   "[I]t is likely that contamination associated primarily with
    multiple other construction related activities identified below
    began soon after commencement of site operations although
    determination of the timing of contamination at many of the
    areas which required remedial measures is blurred  . . . ."[20]

Mr. Anderson, however, does not even attempt to account for any of the specific, contaminating

events that happened at or near the HPEP area, including events during, or about the time of,

Century's policy periods, including:

♦   A massive 1948 fire in the HPEP area that damaged many
    vessels that contained tar and oil, the principal contaminants that
    were remediated at the HPEP;[21]

♦   Substantial oil leaks from an Esso (Exxon) pipeline that was
    constructed sometime before 1949 and that flowed through the
    area of the HPEP;[22]

♦   A massive tar spill from an underground tar pipe in the 1960s,
    referred to as the "Bixby spill";[23]

♦   Significant gas production at the Everett MGP in the 1950s
    (indeed, more than any other time from 1908 to 1940s) that
    would have caused greater tar production and thus greater
    leakage;[24] and

♦   The introduction of new equipment in the early 1950s that would
    have had leaks associated with the start-up of the new
    equipment.[25]

---

[19] See Anderson Op. at 7, Ex. 1.

[20] See id. at 9.

[21] November 18, 2010 Dep. Tr. of C. Anderson at 103:5-10; 172:7-174:5, Ex. 2.

[22] Id. at 104:11-24.

[23] Id. at 154:12-161:3.

[24] Id. at 112:5-115:2 (acknowledging that more gas production equates with more oil and tar
production and more leaks, spills, and contamination).

[25] Id. at 153:11-154:11 (discussing introduction of new equipment); id. at 139:9-140:19
(discussing the "shakedown" effect of new equipment, which results in leaks and contamination).

DSMDB-2863686v8

Despite these prominent events, which Mr. Anderson acknowledges, Mr. Anderson makes no effort to account for greater or lesser amounts of contamination that happened during any particular year or years between 1908 (the beginning of the plant) and 2000 (the start of cleanup), even though he admits that the amount of contamination unquestionably would have varied through the years.[26]

The Bixby spill, for example, happened when a broken underground pipe leaked hot, steaming tar.[27] Enough tar was spilled to fill an area half the size of a football field (50 yards) with at least an inch thick layer of tar.[28] Mr. Anderson's opinion with regard to the tar spill is that all the underground tar, defying the law of gravity, would have primarily migrated upward.[29] As to other events, he simply does not undertake any effort to account for them. Rather, he simply opines that the amount of contamination caused during the various years is "unfilterable"[30] and summarily dismisses such events, without any principled basis for doing so. Mr. Anderson also acknowledges, but makes no effort to account for, the old remediation activities by Metcalf & Eddy, including the removal of thousands of gallons of oil during 1949-1950, which would have removed significant prior contamination at the site.[31]

Mr. Anderson instead reverts to a Century-serving assumption that all of the contamination must be attributed equally across the years beginning with the opening of the MGP in 1908 and

---

[26] *Id.* at 120:23-123:4.

[27] *Id.* at 155:11-156:20.

[28] *Id.* at 155:11-156:2.

[29] *Id.* at 160:14-161:3.

[30] *Id.* at 120:10-22.

[31] *Id.* at 143:19-144:22 (acknowledging removal of oil); *see also* Expert Report of N. Shifrin at 3, Ex. 8.

ending in the 1990s/2000s.[32]  This is nothing more than the argument of Century's counsel.  Mr.

Anderson's conclusions are not the product of a valid scientific method.  He admits that during his

"analysis" he *made no notes* and did no calculations of the damage that was caused during

Century's policy years.[33]  His testimony on this issue should be precluded because he produced no

work papers showing any analysis and has made it impossible for another expert to reproduce

what he did.  *See United States v. Green*, 405 F. Supp. 2d 104, 120 (D. Mass. 2005) (excluding

expert witness's conclusion because, among other reasons, "the absence of notes . . . in the initial

examination makes it difficult, if not impossible, for another expert to reproduce what [he] did");

*United States v. Monteiro*, 2005 U.S. Dist. LEXIS 39062, at *14-15 (D. Mass. Nov. 28, 2005)

("Until the basis for the identification is described in such a way that the procedure performed by

Sgt. Weddleton is reproducible and verifiable, it is inadmissible under Rule 702.").

Despite his *ipse dixit* pronouncements that it would be impossible to quantify the damage

during any particular year, Mr. Anderson even admits that it would be impossible to replicate the

results of his analysis.  To test his conclusions he would tell an objective observer to seek a second

opinion:

> Q.  How would they replicate your analysis to see if they could test your conclusion?
>
> A.  Get a skilled hydrogeologist who has the knowledge that I have of the Everett site and look at it and look at the materials that I looked at and the boring log information and so forth and ask them what they see.[34]

---

[32] November 18, 2010 Dep. Tr. of C. Anderson at 120:20-22, Ex. 2 ("I'm saying we don't know how much [contamination] was distributed in any one single year . . . .").

[33] *Id.* at 184:16-185:9.

[34] *Id.* at 185:16-187:14.

DSMDB-2863686v8

Mr. Anderson's testimony has not applied sound principles and methods to the facts of this case, and it is impossible to test Mr. Anderson's "method, technique, or theory" for allocating property damages equally across the entire period from 1908 to 2000. Mr. Anderson's opinions regarding the timing of contamination at the Everett MGP cannot be tested and do not meet the federal standard for expert testimony. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 593-95.

II.     MR. ANDERSON'S OWNED PROPERTY OPINION IS NOT BASED ON THE FACTS OF THIS CASE NOR THE SCOPE OF THE REMAND

>   A.     Century's Expert Robert Atwood Admitted, And Mr. Anderson Was Forced To Agree, That 171,348 Gallons Of Groundwater And 110 Drums Of Liquids And Resins Were Remediated During The HPEP

In support of Century's owned property argument for the remedial measures undertaken during the HPEP, Mr. Anderson opines that "HPEP remedial response measures were not conducted to remediate groundwater."[35] Mr. Anderson's opinion, however, is not based on the facts of this case. During the November 5, 2010 deposition of Century's other expert, Robert Atwood, he testified that 171,348 gallons of contaminated groundwater were removed during the HPEP and transported off-site for treatment.[36] Under oath, Mr. Anderson was forced to admit that 171,348 gallons of groundwater were removed during the HPEP and transported off-site to treat the contaminated groundwater:

>   Q. There was 171,348 gallons of water removed from the site and treated for contamination, correct?

>   A. Correct.[37]

---

[35] Anderson Op. at 7, Ex. 1.

[36] November 5, 2010 Dep. Tr. of R. Atwood at 96:17-97:3, 102:9-103:20, 139:1-140:14, Ex. 4.

[37] November 18, 2010 Dep. Tr. of C. Anderson at 219:2-21, Ex. 2. Mr. Anderson initially attempted to avoid answering this straightforward question, and finally only relented after Boston Gas was forced to repeat the same question multiple times. *Id.* at 217:19-219:21. This exchange is emblematic of Mr. Anderson's efforts to avoid testifying about matters that are inconsistent with Century's positions in this case. As demonstrated numerous times, during the deposition Mr. Anderson performed as an advocate not an independent expert, attempting to avoid difficult

In addition, when under oath, Mr. Anderson was forced to concede that an additional 110 drums of liquids and resins were removed from the site and treated for contamination during the HPEP to protect third-party property, including surface water:

> Q.  Were those liquids and resins contaminated?
>
> A.  They were part of I believe the bulk of that was the treatment of liquids that Boston Gas was required to treat because they had overloaded their recharge system at the site and had to discharge it, they didn't have the capacity to discharge it into the groundwater due to overloading. <u>And they were treated to meet surface water standards because the stuff went to the surface water.</u>[38]

In addition to ignoring the specific instances of groundwater and surface water related remediation, Mr. Anderson ignores the finding of the Licenses Site Professional who oversaw the response of the company at the Everett Site ("LSP"). Mr. Anderson reached a factually, scientifically, and legally impossible global conclusion that "[t]here's no soil on the site ongoing that has a relationship to groundwater."[39] The LSP has found differently. The LSP is the environmental consultant authorized by the Commonwealth of Massachusetts to render the decisions to protect the environment around the Everett site under the Massachusetts environmental regulations known as the Massachusetts Contingency Plan ("MCP"). The LSP identified soil contamination in the area of the HPEP that exceeded the Upper Concentration Limits ("UCL") set by the Commonwealth of Massachusetts. Under the MCP, the UCL exceedances are considered a per se threat to surface water, and must be addressed by an

---

questions and parry with non-responsive answers that were nothing more than Century's talking points. *See e.g.*, *id.* at 217:19-218:6.

[38] *Id.* at 222:15-223:4 (emphasis added).

[39] *Id.* at 262:25-263:7.

DSMDB-2863686v8

environmental response to protect the surface water.[40]  Mr. Anderson, however, ignores the LSP's

findings, and seemingly second-guesses the existence of UCL soil exceedences:

> Q.  It sounds like what you're saying is you would second-guess the LSP's decision on the use of exceedences?
>
> A.  I'm saying what I reviewed does not convince me that there was a UCL exceedence.  There very well may have been because it was the nature of how they did it.  But surely there was a UCL exceedence for arsenic so I think it's a moot point.[41]

Mr. Anderson also ignores the LSP's conclusion that 21,199 cubic yards of soil in the area of the

HPEP contained contamination that required the soil to be shipped off-site, and as a result the soil

had to be remediated to prevent contamination at third-party property.[42]  The LSP's determinations

demonstrate that under the test explained by the First Circuit, all of these costs are compensable:

"remediation necessary to protect against off-site contamination is compensable."[43]  Mr.

Anderson's admitted lack of expertise in the MCP may explain his failure to give appropriate

weight to the LSP's findings.

Mr. Anderson's owned property analysis attempts to minimize the costs associated with

the remediation of groundwater and surface water, and the relationship between soil and

groundwater contamination, by ignoring the facts of this case.  In doing so, Mr. Anderson's

analysis, and the resulting opinion, fail to meet the standards of Rule 702.[44]

---

[40]  November 5, 2010 Dep. Tr. of R. Atwood at 147:24-148:11, 149:19-152:13, 155:13-157:2, Ex. 4.

[41] November 18, 2010 Dep. Tr. of C. Anderson at 239:4-12, Ex. 2.

[42] *Id.* at 228:21-236:23.

[43] *Boston Gas Co. v. Century Indem. Co.*, 529 F.3d 8, 17 (1st Cir. 2008).

[44] Mr. Anderson also attempts to avoid the facts of this case by opining that the remediation was for construction purposes.  Anderson Op. at 8, Ex. 1.  The First Circuit already has held the DOMAC's construction purpose is irrelevant to the pertinent question:

> The "purpose" of the removal may, as Century claims, have been to forward the DOMAC expansion; but the relevant question under the policy and

DSMDB-2863686v8

B.   Mr. Anderson's Owned Property Opinion Also Exceeds The Scope Of The Owned Property Remand Related To The HPEP Area

Mr. Anderson opines that "Boston Gas has incurred $4,450,565 in past costs related to the HPEP project."[45] Mr. Anderson's opinion attempts to expand the owned property issue beyond the remand ordered by the First Circuit, which remanded $3.5 million of costs that Century successfully identified on appeal as relating to the HPEP:

> Boston Gas also says that Century provided no evidence that would have allowed the jury to determine that some of the on-site costs were solely for the benefit of the site and not necessary to prevent further off-site pollution.  Yet substantial costs (Century says $3.5 million) were incurred to remove soils and for other work incident to a project undertaken in 2000 by DOMAC to expand its operations at the Everett site-or at least the jury could have so found.  These costs are part of the award against Century.

> For example, among other steps, DOMAC removed contaminated soils and liquids from underground storage tanks-these tanks were buried under the Everett site when DOMAC first purchased the property in 1970-at a cost to Boston Gas (under a sharing agreement with DOMAC) of around $1.6 million.  Century says that this was clearly done for the purpose of giving DOMAC a firm foundation for its own facilities and not as remediation or prevention of further off-site damage.

> The fact that the jury verdict included the disputed costs shows only that the jury believed that *some* costs targeted pollution that damaged or threatened off-site property.  So we must remand for a new trial on this issue.  This is a relatively narrow issue, but the amounts are not trivial.  In all events, the principle is clear: only that remediation necessary to protect against off-site contamination is compensable; further costs, however useful to mitigate on-site contamination, are not.[46]

---

*Hakim* is whether the removal of that soil was also objectively necessary because contaminants in the soil posed a threat to off-site property as well.

*Boston Gas*, 529 F.3d at 17.  In addition, under oath, Mr. Anderson was forced to concede that he is not an expert on construction, nor is he an expert on the Massachusetts environmental regulations. November 18, 2010 Dep. Tr. of C. Anderson at 36:14-19, 239:13-15, Ex. 2. Moreover, Mr. Anderson admitted that the environmental remediation of the groundwater, liquids, and soils took place after those materials were removed from the construction zone, and at that point the environmental remediation was not in any way pertinent to the construction project. *Id.* at 241:10-242:5.

[45] Anderson Op. at 7, Ex. 1.

[46] *Boston Gas*, 529 F.3d at 17.

15

The additional $900,000 that Mr. Anderson now attempts to shoehorn into the HPEP is contrary to Century's successful appeal and the First Circuit's remand, which addressed only the $3.5 million that Century identified on appeal.  The First Circuit explicitly limited the remand to "these costs," because other than the $3.5 million the First Circuit addressed, Century presented no evidence of other costs that would have allowed the jury to find for Century on the owned property exclusion. The Court should strike Mr. Anderson's opinion concerning $4.45 million as contrary to the remand from the First Circuit.[47]

III.     THE COURT SHOULD PRECLUDE MR. ANDERSON FROM OFFERING EXPERT OPINIONS REGARDING COST ANALYSIS

Using a similar approach to that he used in 2004, Mr. Anderson's cost analysis opinions apportion Boston Gas' past costs at the Everett MGP into four buckets selected by Century's counsel: "investigation costs," "remediation costs," "general business expenditures," and "legal costs."[48]  Mr. Anderson further sub-categorizes the "remediation costs" into "groundwater/surface water related remediation costs" and "soil related remediation costs."[49]  Mr. Anderson's cost analysis is not based on any reliable methodology, nor are the opinions pertinent to either of the two issues that are to be addressed on remand.

Mr. Anderson's cost analysis reflects Mr. Anderson's concepts of an "equitable allocation" of costs between various categories selected by Century, and his judgment calls.  Mr. Anderson's testimony establishes that:

- There is no objective criteria governing the remedial cost analysis that Mr. Anderson performed;[50]
- There is no licensing, peer review, or objective criteria to establish qualification for expertise in remedial cost analysis;[51]

---

[47] No additional HPEP-related costs have been incurred since trial that would warrant any increase of the costs that could be associated with the HPEP.

[48] Anderson Op. at 5-6, Ex. 1.

[49] Id. at 6.

[50] November 18, 2010 Dep. Tr. of C. Anderson at 32:22-34:25, 255:13-257:8, Ex. 2.

DSMDB-2863686v8

♦    Mr. Anderson's cost analysis is not related to any requirement under the Massachusetts Contingency Plan, which governs the environmental responses at the Everett MGP;

♦    Mr. Anderson is not an expert on the Massachusetts Contingency Plan;[52]

♦    Century dictated the categories that form the basis for Mr. Anderson's cost analysis;[53]

♦    Mr. Anderson's cost analysis apportioned costs based on Mr. Anderson's consideration of what would be an "equitable allocation" and based on his "judgment calls";[54]

♦    In numerous instances, Mr. Anderson divided single tasks among multiple categories, including factually impossible divisions for a single task that allocated 50% of a single task to groundwater remediation and the other 50% of that single task to soil remediation unrelated to groundwater;[55]

♦    Mr. Anderson even divided single tasks among these incompatible categories when he was missing the invoices that detailed the actual work that was performed;[56] and

♦    Mr. Anderson did not apply uniform principles or methodology to his cost analysis, but instead made ad hoc judgments that he could not explain during his deposition.[57]

Mr. Anderson's methodology lacks any objective indicia of reliability and fails to meet the requirements for expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (Rule 702 "'establishes a standard of evidentiary reliability'" for all expert matters "'as a precondition to admissibility'" (quoting *Daubert*, 509 U.S. at 590, 592)).

In addition, Mr. Anderson's cost analysis is irrelevant. It does not relate to the timing issue, nor the narrow owned property issue that are the subjects of the remand. Mr. Anderson's cost analysis does not attempt to perform any form of apportionment based on the timing of

---

[51] *Id.* at 32:22-34:25.

[52] *Id.* at 36:14-19.

[53] *Id.* at 193:2-194:7.

[54] *Id.* at 255:13-257:8; 261:10-262:8.

[55] *Id.* at 251:5-262:8.

[56] *Id.* at 262:9-264:8.

[57] *Id.* at 257:9-261:9.

DSMDB-2863686v8

contamination, and is wholly unrelated to timing.  Moreover, as addressed above, the owned

property issue on remand relates only to the costs incurred during the HPEP.  Mr. Anderson's cost

analysis, however, is not limited to the HPEP, but rather addresses all costs that Boston Gas has

incurred for environmental responses at the Everett site, even costs that Century conceded are

unrelated to the HPEP.  Although Boston Gas and Century apparently disagree as to whether Mr.

Anderson's HPEP cost analysis must be limited to the $3.5 million remanded by the First Circuit,

there is no disagreement concerning non-HPEP costs – they are not at issue in the owned property

remand and there is no other issue in dispute to which the cost analysis would be relevant.[58]

Expert testimony is only admissible if it is relevant to issues that are in dispute in the

proceeding.[59]  Expert opinions on issues that are irrelevant or not the subject of the trial are not

---

[58] Century has previously attempted to argue that costs Mr. Anderson apportioned to the investigation category were not covered under the Century insurance policies.  Century's argument was factually and legally incorrect and rejected by the jury and Judge Zobel.  The jury awarded Boston Gas all of its environmental response costs as damages, consistent with Massachusetts law.  Everett Jury Verdict (Pacer #412); *see also* Massachusetts law, which establishes that environmental responses costs, including "assessment" (i.e., investigation costs), are "damages."  *See Martignetti v. Haigh-Farr Inc.*, 680 N.E.2d 1131, 1139 n.22 (Mass. 1997) ("'Response' is defined in G.L. c. 21E, § 2, as including assessment, containment, and removal, and so the term 'response costs' is equivalent to the costs of 'assessment, containment and removal . . . .'"); *see also Oliveira v. Pereira*, 605 N.E.2d 287, 289 (Mass. 1992) ("As responsible persons under the Act [21E], the defendants were liable for the 'costs of assessment, containment and removal' of contamination at the site."); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 583-84 (Mass. 1990) (environmental responses costs imposed by federal or state governments are damages).  Judge Zobel determined that Century's policies were required to cover Boston Gas' "investigation and cleanup."  *See* June 21, 2006 Judgment, (PACER #437); *see also Boston Gas*, 529 F.3d at 20.  Century never appealed the award of investigation costs and Judge Zobel's determination that the policies covered such costs.  Thus the issue is resolved:  "Century cannot re-argue matters that have already been decided."  *Boston Gas*, 529 F.3d at 20.

[59] *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) ("[E]xpert testimony must be relevant not only in the sense that all evidence must be relevant [under Rule 402], but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.  In other words, Rule 702, as visualized through the *Daubert* prism, 'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'").

18

admissible, and must be stricken due to the likely confusion that would be caused by the admission of the irrelevant opinions. *See* Fed. R. Evid. 402.[60]

## CONCLUSION

Any one of the flaws described above is independently sufficient to render the testimony of Mr. Anderson inadmissible under the standards articulated by Rule 702. Together, these flaws render his testimony and analysis regarding timing of contamination at the Everett site unreliable and irrelevant. For the reasons stated above, Boston Gas respectfully requests that the Court preclude his testimony and expert report at trial.

Dated: November 22, 2010

Respectfully submitted,

Martin C. Pentz (BBO#394050)
Foley Hoag LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 832-1000

and

David L. Elkind
John A. Gibbons
Kenneth B. Trotter
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006-5403
(202) 420-2200

Attorneys for Boston Gas Company

---

[60] *See also Ruíz-Troche*, 161 F.3d at 81 (expert testimony must be relevant).

DSMDB-2863686v8